CAPITOL HILL HOSPITAL, et al. and Irene Trowell Harris, Personal Representative of the Estate of Jack Trowell, M.D., Appellants,

v.

Venus BAUCOM, Personal Representative of the Estate of Luerinda BAUCOM, Appellee.

Nos. 94–CV–275, 92–CV–282.

District of Columbia Court of Appeals.

Argued Sept. 7, 1995.

Decided May 29, 1997.

Brian J. Nash, with whom Stuart N. Herschfeld, Bethesda, MD, was on the brief, for appellant Capitol Hill Hospital in No. 94–CV–282.

James M. Heffler, with whom Diane M. Fruchter, Washington, DC, was on the brief, for appellant Irene Trowell Harris in No. 94–CV–275.

William S. Thompson, with whom John F.X. Costello, Lanham, MD, was on the brief, for appellee.

Before WAGNER, Chief Judge and SCHWELB and RUIZ, Associate Judges.

PER CURIAM:

The judgment is reversed, and the case is remanded to the trial court for further consideration of the question whether, during *voir dire*, counsel for plaintiff exercised his peremptory challenges in a racially discriminatory manner. On remand, the trial judge shall accord appropriate weight to the statistical evidence, and shall apply a more rigor-

ous standard of scrutiny to counsel's explanations for his strikes.

*So ordered.*

RUIZ, Associate Judge, concurring.

Appellants, Capitol Hill Hospital and Irene Trowell Harris, contend that trial counsel for appellee, Venus Baucom, employed peremptory strikes for discriminatory purposes in contravention with the holdings of the United States Supreme Court and this court. The trial court concluded that appellee's counsel had not intentionally struck the jurors because of their race. Because the trial court's consideration of the challenge that appellee's peremptory strikes were constitutionally defective under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was flawed, the case should be reversed and remanded for a proper redetermination, if still possible, or, if not, for a new trial.

I.

*Factual Background*

Appellee, Venus Baucom, as personal representative of the estate of her grandmother, Luerinda Baucom,[1] deceased, brought a medical malpractice action against appellants, Capitol Hill Hospital (the "Hospital") and Jack Trowell, M.D.[2] According to the complaint, decedent was admitted to the Hospital on May 11, 1988, under the direction of Dr. Trowell—decedent's private attending physician—with complaints of abdominal pain, dehydration, weight loss, anorexia, anemia, and a history of falls. The complaint primarily alleges that due to the Hospital's and the doctor's negligence, including the failure to order the use of a "posey" restraint, decedent fell again on May 13, 1988, and fractured her left hip. She was operated on the following day to repair the fracture. During the course of subsequent treatment for her hip fracture, decedent suffered acid burns to the wound,[3] causing further injury. Baucom

1. A seventy-five-year-old, African–American woman.

2. Dr. Trowell died in July 1993; his estate was substituted as a defendant. Appellant Irene Trowell–Harris is the personal representative of Dr. Trowell's estate.

3. Because decedent's wound was healing poorly, an infectious disease specialist was consulted regarding patient care management on May 19, 1988. As a result of this complication, on May 28, the orthopedic surgeon ordered that a one-percent acetic acid wet-to-dry dressing be applied once every eight hours during a twenty-

alleges that this additional injury resulted from *improper application of acetic acid* dressing to the surgical wound by members of the Hospital staff.

The record reflects that as a result of the concentration of the acetic acid being higher than prescribed, decedent sustained a second and third degree burn on the left hip from the acetic acid applied to the wound. The record also reflects that decedent fell yet again attempting to go to the bathroom on July 1, 1988. Decedent was discharged on July 13, 1988, from the Hospital to Grosvenor Nursing Home, which refused her admission and returned her to the Hospital because she needed continued care of the caustic burn on her left hip. Decedent remained a patient at the Hospital until August 1, 1988, when she was discharged and admitted to Grosvenor Nursing Home, where she remained until she died of unrelated causes on October 13, 1988.

The Hospital and Dr. Trowell denied the allegations of negligence in Baucom's complaint. The action came to trial and a jury was chosen. At the close of jury selection, the Hospital and Dr. Trowell made a *Batson* challenge to Baucom's use of peremptory strikes which was denied by the trial court. The case was tried to the jury, which returned a verdict for Baucom in the amount of $300,000. After judgment was entered in accordance with the jury verdict, notices of appeal were timely filed by both the Hospital and Dr. Trowell.

*Jury Selection*

There were twenty-eight members in the venire of potential jurors, of whom five were not African–Americans. Of the fourteen prospective jurors who were seated in the jury box before the parties exhausted their peremptory strikes, only three were not African–Americans, Jurors # 061, # 494 and # 800. Baucom's counsel had three peremptory strikes and used all three to eliminate these three prospective jurors. The resulting jury was all African–American.[4]

Baucom's counsel first struck Juror # 061, a twenty-six-year-old Caucasian woman, who worked as an accountant for GreenPeace Development. Baucom's counsel did not ask her any questions.

Baucom's counsel's second peremptory strike was on Juror # 494, also a Caucasian woman, who worked as vice-president of a management consulting firm with hospitals and physician organizations among its clients. During voir dire, she stated that her work did not relate to medical malpractice and that she was not familiar with the Hospital. Additionally, in response to questioning by Baucom's counsel, Juror # 494 indicated that although she "would err on the side of understanding the issues" facing hospitals and doctors, she would endeavor to set aside her own experiences in order to render an impartial verdict in this matter. Baucom's counsel did not ask her any further questions.

Appellee's counsel's third peremptory strike was used on Juror # 800, another Caucasian woman, with a Hispanic surname. At the time of the voir dire, this juror was the director of a maternal and child health clinic, a position she had held for the previous five years. Juror # 800 had done a six-week internship in the Outpatient Clinic at the Hospital in 1975, in connection with her nursing training. She indicated that she could fairly decide this case on the merits. Baucom's counsel asked Juror # 800 whether she had an ownership interest in the company in which she worked and whether she ever had the opportunity to apply posey restraints to a patient. Juror # 800 answered that she had no ownership interest in the clinic, and that she had some experience applying posey restraints.

At the close of jury selection, the trial court inquired if counsel were satisfied with the process. The Hospital's counsel objected, challenging Baucom's counsel's use of peremptory strikes pursuant to *Batson v. Kentucky, supra,* and moved for a mistrial. Dr. Trowell joined in this challenge. In sup-

---

four-hour period. Thereafter, on May 31, the skin around the wound was noted to be desquamated—shedding, peeling or scaling off of the epidermis—and discolored.

4. In his concurring opinion, Judge Schwelb summarizes in chart form the race of each prospective juror seated in the jury box during each successive round. *See* pages 768–769, *post.*

port of their motion for mistrial, counsel argued to the trial court that Baucom's counsel had eliminated all of the prospective Caucasian jurors who had progressed to the jury box during jury selection for the purpose of empaneling an all African–American jury. In particular, counsel brought to the trial court's attention that Baucom's counsel's first strike, Juror # 061, a twenty-six-year-old Caucasian woman who was never asked a single question, was inconsistent with counsel's failure to strike Juror # 862, also a twenty-six-year-old woman, but an African American.

In response to the *Batson* challenge, Baucom's counsel gave his reasons for exercising the peremptory strikes as he did. With regard to the first strike, Juror # 061, Baucom's counsel stated that she was struck, not because of her race, but that because of her apparent youth, she would be "[un]able to relate to the ability of a seventy-five-year-old lady to ambulate after having suffered a stroke." [5] Additionally, Baucom's counsel noted that this juror was employed by GreenPeace Development and that he was not interested in having someone working for an organization with "something of a liberal nature" on the jury. Moreover, Baucom's counsel stated that Juror # 061 was struck "on the basis that in looking at her and in looking at the way that she responded to the questions, I struck her on that basis." [6]

With regard to his second strike, against Juror # 494, Baucom's counsel stated that his strike had nothing to do with Juror # 494's race, pointing out that the court itself thought she would be a good peremptory strike.[7] Further, counsel explained that he struck her because of her association with the management of doctors and hospitals and also because during voir dire Juror # 494 had answered that she was unable to measure the extent to which her background would prejudice her with respect to the merits of the case.

Baucom's counsel stated that his third strike, against Juror # 800, was based on the fact that she was a nurse with training in applying posey restraints and worked in the medical field. He stated that he feared that she would substitute her training and skill for the opinion of Baucom's experts.[8]

The Hospital's counsel pointed out to the judge a number of inconsistencies in the proffered race-neutral reasons. With regard to Juror # 061, the twenty-six-year-old Caucasian woman who worked for GreenPeace, Baucom's counsel had stated that she was struck primarily because of her age. As the Hospital's counsel emphasized, however, Juror # 862, another twenty-six-year-old woman, but who was African–American, was not struck by Baucom's counsel. The Hospital's counsel also argued that it was the first time he had heard a plaintiff's attorney indicate that a presumably liberal individual was someone that a plaintiff would not want seated on her case. In response, Baucom's counsel stated that after he struck Juror # 061, he had no more strikes left to strike Juror # 862 because she had been seated after the third round.[9] The Hospital's counsel observed that if age had been of such great

---

5. Baucom's counsel summarized as follows:

It's my prerogative to strike anybody that I want for any reason other than the basis of their sex or race or religion. I didn't strike her on the basis of her sex or religion.

Your Honor, I struck her on the basis that in looking at her and in looking at the way that she responded to the questions, I struck her on that basis.

I don't believe that she would be able to sit and judge the ability or non-ability of a 75 year old lady to ambulate.

In addition, her employment with GreenPeace was such that at least to my experience, I thought that I didn't want her sitting here judging a hospital case of this nature.

6. The voir dire transcript, however, does not reflect Juror # 061 as having answered any questions prior to being stricken.

7. In fact, however, the transcript reveals that the trial court had indicated that Juror # 800 (not Juror # 494) "may be a very attractive candidate for a peremptory [strike]," after it denied counsel's request to strike Juror # 800 for cause.

8. See note 7, *supra*.

9. In fact, however, Baucom's counsel had two strikes left because Juror # 061 was struck in the first round and Juror # 862 was seated after the second round. Therefore, Baucom's counsel had an opportunity to strike Juror # 862 during the third round. See page 764, *infra*.

concern Baucom's counsel could have struck into the panel to eliminate Juror # 862.

With respect to the strike against Juror # 800, counsel for the Hospital pointed out to the trial court that there were several African–American jurors, who where not struck, with similar backgrounds and experience as Juror # 800, who was struck. Specifically, counsel argued that Juror # 668, an African–American who sat on the jury, had nursing assistance experience in geriatrics and experience with the use of posey restraints; however, Baucom's counsel did not question or strike her. Additionally, Hospital's counsel pointed out that Juror # 747, who was struck by the Hospital and not Baucom's counsel in the first round, was a certified medical aide for seven years. When Baucom's counsel inquired from Juror # 747 whether she had ever applied a posey restraint, she responded that she had. Nevertheless, Baucom's counsel did not ask her any other questions and did not strike her.[10] The Hospital's counsel argued that the only distinguishing characteristic between Juror # 668, who remained on the jury, Juror # 747, who was struck by him, and Juror # 800, who was struck by Baucom's counsel, was that Juror # 800 was not African–American.

Without asking for any further explanation from either party, the trial court ruled that there was no basis for a *Batson* challenge. The trial court stated that because the numbers were so small, a statistical analysis could not be applied. Furthermore, the court stated that since statistics were inapplicable, it was necessary to establish that Baucom's counsel had a personal animosity toward, or an intention to remove, people from a particular race. Assuming that a prima facie case had been made, the trial court found counsel's responses persuasive. The

trial judge found counsel's articulation of why Juror # 494 was stricken to be very convincing. With respect to the explanation as to why Juror # 061 was stricken, the trial court found it to be "less convincing but still not irrational." He also stated, however, that he did not find Baucom's counsel's explanation with respect to Juror # 061's employment with GreenPeace "completely or immediately persuasive."[11] The trial court found that Baucom's counsel's explanation for wanting to strike her because of her age was "understandable." The trial judge also found that Juror # 800, the Caucasian woman with a Hispanic surname, was under a different racial category for *Batson* purposes and that, in any event, she was stricken for a satisfactory reason.[12] In short, the trial judge found that the reasons given were not pretextual and that the strikes were reasonable and exercised in good faith. Further, the trial judge found no invidious or "indirect discrimination arising from the impact of the way that the panel was composed or the way that the rounds were permitted to go in making the peremptories." The trial court considered that since the venire itself was ninety-five percent African–American, it was not surprising that the resulting jury was all African–American.[13] Therefore, appellants' motions for a new trial were denied, and a trial took place, leading to the jury verdict for Baucom.

During his *Batson* challenge, counsel for the Hospital cautioned the trial court that "you don't know if it's a *Batson* situation until you see all of the strikes." As described above, trial counsel identified two jurors (# 668 and # 747) who were not struck by Baucom's counsel notwithstanding their previous experiences with posey re-

---

10. Each counsel's peremptory strikes were separately submitted in writing to the trial court.

11. The judge stated:
    Now, with respect to 061, I don't think that I find Mr. Costello's explanation completely or immediately persuasive ... I don't understand how someone employed at Greenpeace ... I don't know exactly according to his calculations ... that he has a view someone associated with that organization might have some view about nature taking its course and the survival of the fittest or that it's wrong to

lavish too many resources on old people or in keeping them in good shape or whatever and that may be his reason behind it.

12. See note 7, *supra.*

13. This percentage is incorrect. Of the venire of twenty-eight persons, five, or eighteen percent, were not African–Americans. As mentioned *supra*, at 4, of the fourteen prospective jurors who were considered during jury selection, three, or twenty-two percent, were not African–Americans.

straints. On appeal, appellants supplement this contention by arguing that a number of other potential jurors also could have been stricken pursuant to Baucom's counsel's reasoning, but they were not struck because they were African–Americans. Juror # 836 worked at the Hospital from 1960 through 1971 as a nurse on the evening shifts with some experience applying posey restraints; her mother had been treated by the same orthopedic surgeon who treated decedent, and was satisfied with his care. Furthermore, even though this juror stated that she had nothing but "good vibes" from the Hospital and its administration, the only inquiry made by Baucom's counsel of this juror was whether she had ever applied restraints.[14] Juror # 862, a twenty-six-year-old African–American woman, was not struck or questioned by Baucom's counsel even though she had a sister who worked at Capitol Hill Hospital. On appeal, the Hospital and Dr. Trowell clarify that Juror # 862 was seated after the second round of strikes and not the third round as had been misstated by both parties at trial. Therefore, contrary to Baucom's counsel's explanation to the trial court that he had no strikes left after striking Juror # 061 with which to strike Juror # 862, Baucom's counsel still had an opportunity to strike Juror # 862 in the third round. Instead, he chose to strike Juror # 800, the Caucasian Hispanic nurse, according to the Hospital and Dr. Trowell, because she was not African–American. They further note on appeal that during the voir dire, Baucom's counsel made detailed inquiries of the Caucasian venire members, and only superficial inquiries of the African–American members. Particularly, of the four panel members with nursing experience, one of whom was Caucasian and the other three African–Americans, Baucom's counsel asked the Caucasian and two of the African–Americans about their experience with posey restraints. Although each responded having had such experience, Baucom's counsel only pursued the questioning with respect to the Caucasian nurse and struck her.

## II.

In *Batson v. Kentucky, supra,* the Supreme Court set forth a three-step process for evaluating whether counsel's use of peremptory strikes violates the Equal Protection Clause.[15] 476 U.S. at 96–98, 106 S.Ct. at 1722–24. First, the party challenging the strike must make a prima facie showing that the peremptory challenge was based upon race. *Id.* Second, after a prima facie showing has been made by the moving party, the burden shifts to the non-moving party to articulate a legitimate race-neutral reason for striking the juror in question. *Id.* Third, the trial court must determine whether the moving party carried the burden of proving purposeful discrimination. *Id.*

We have stated with respect to the first step, that "the burden of establishing a prima facie showing is not onerous and that its primary function is to eliminate the most common nondiscriminatory reasons for the ... peremptory strikes." *Little v. United States,* 613 A.2d 880, 885 (D.C.1992). Similarly, we have said with respect to the second step, that the "burden in rebutting a prima facie case is neither onerous nor time-consuming." *Id.* at 888.[16] Thus, in the context of evaluating a *Batson* challenge the responsibility falls on the trial court, in the third step of the process, to determine whether the race-neutral explanations are merely a pretext for racial discrimination. *Purkett, supra,* 514 U.S. at 767–69, 115 S.Ct. at 1771 ("It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."); *see Moore v. Keller Indus., Inc.,* 948 F.2d 199, 201 (5th Cir.1991). On appeal from the trial court's determination,

---

14. Juror # 836 replied she had not done so.

15. In *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the Court applied the *Batson* reasoning to civil actions.

16. With respect to the proponent's burden during the second step, the Supreme Court has said that "a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v. Elem,* 514 U.S. 765, 769, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995).

"[a] trial court's findings pertaining to purposeful discrimination turn largely on evaluations of credibility and are entitled to great deference ... [b]ut unless the trial court rigorously scrutinizes the ... race-neutral explanations, *Batson*'s promise ... will be an empty one." *Tursio v. United States,* 634 A.2d 1205, 1210–11 (D.C.1993). In light of these principles, the trial court erred in its consideration of the *Batson* challenge in this case.

First, the trial court erred in entirely discounting the statistical evidence. In *Tursio,* the fact that the prosecutor used ninety percent of his peremptory strikes against a group that constituted twenty-six percent of the venire was sufficient to establish a prima facie case. *Tursio, supra,* 634 A.2d at 1213. In this case, the statistics are even more troubling because Baucom's counsel used one hundred percent of his peremptory strikes against a group that comprised only eighteen percent of the venire and twenty-two percent of the persons who were seated in the jury box during jury selection.[17] The end result, as in *Tursio,* was an all African–American jury. The trial court's view was that because the numbers were so small the statistics were insignificant.[18] Although statistics may be less elucidating when based on a small sample, the fact that Baucom's counsel used all of his strikes on a small pool of potential Caucasian jurors strengthens the conclusion that the trial court should not have discounted the statistics. To the contrary, these statistics should have alerted the trial court to the possibility of jury manipulation on impermissible grounds. As Judge Schwelb explains in his separate opinion, based on the race of the prospective jurors seated in the jury box during each successive round, the probability that a non-African-American would randomly be struck declined significantly with each round. *See* pages 769, 770, *post; Batson, supra,* 476 U.S. at 95, 106 S.Ct.

at 1722 ("[T]he Court has declined to attribute to chance the absence of black citizens on a particular jury array where the selection mechanism is subject to abuse."). Even though these statistics, without more, do not conclusively prove that there was a discriminatory purpose behind Baucom's counsel's peremptory strikes, they were sufficient, when considered in the context of counsel's unpersuasive reasons for striking Juror # 061, to make a prima facie case and to require that counsel explain his strikes. *Little, supra,* 613 A.2d at 886. ("[T]he defendant is required to 'come forward with *facts* not just numbers alone,' in making a prima facie showing ... although the trial court may examine statistical disparities as one factor in assessing the prima facie case.") (quoting *United States v. Moore,* 895 F.2d 484, 485 (8th Cir.1990)).

Second, the trial court did not consider all relevant factors when it credited Baucom's counsel's explanations concerning Juror # 061, the Caucasian twenty-six-year-old GreenPeace worker. The trial court failed to consider the disparate treatment given to Juror # 061 in relation to Juror # 862, even though the disparity was pointed out by the Hospital's trial counsel. Although in the first round, Baucom's counsel chose to strike Juror # 061 instead of Juror # 800—the Caucasian, Hispanic nurse—during the final round, Baucom's counsel thought it more important to strike Juror # 800 rather than Juror # 862, the twenty-six-year-old, African–American female clerk. Therefore, Juror # 061 (the twenty-six-year-old Caucasian GreenPeace worker) was treated disparately from similarly-situated Juror # 862 (the twenty-six-year-old, African–American clerk). As we found wanting in *Tursio,* the trial court "focused exclusively on whether the ... explanations about each rejected juror were logical and believable rather than assessing each challenge in the entire context of the case and probing the [appellee's coun-

**17.** As noted *supra,* at note 13, the trial court appears to have operated under the incorrect impression that the venire was ninety-five percent African–American; in fact it was eighty-two percent African–American.

**18.** The trial court was also of the view that the prospective Hispanic Juror, a Caucasian woman,

was in a separate category for [*Batson* ] analysis. Although that observation would be correct if the charge were that Hispanics were being struck, it is not relevant where the challenge is that jurors were struck because they were not African–American. *See* concurring opinion of Judge Schwelb, page 768, footnote 4, *post.*

sel] to determine why he had treated similarly situated black and white persons differently." *Tursio, supra,* 634 A.2d at 1211–12. As *Tursio* further states, the credibility of individual explanations as to each stricken juror are not sufficient to rebut a prima facie showing of racial discrimination when jurors of different races who are similarly situated receive different treatment. *Id.* at 1212. As in *Tursio,* a more comprehensive scrutiny was necessary in this case with respect to the peremptory strike of Juror # 061. Therefore, the trial court erred by not considering the full context in which this strike was made—as the Hospital's counsel pleaded that it should do—and instead, evaluating in isolation each explanation given by Baucom's counsel.

Finally, the trial court erred when it accepted at face value counsel's proffered race-neutral explanations even after the Hospital pointed out that Baucom's counsel struck only the prospective jurors who were not African–American and gave reasons why the proffered explanations appeared to be pretextual.[19] The Hospital's counsel identified a number of apparent inconsistencies between the explanations given and the actual exercise of the peremptory strikes. The trial court itself found Baucom's counsel's explanations with respect to the strike of Juror # 061 less persuasive than others. Under these circumstances, the court should have adopted a more questioning attitude toward the proffered explanations. *Purkett, supra,* 514 U.S. at 767–69, 115 S.Ct. at 1771 ("At that stage [the judge's determination whether there was known purposeful discrimination], implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."). Notwithstanding our deferential standard of review, the trial court's failure to evaluate independently the challenged peremptory strikes and the proffered reasons in the overall context of jury selection undermines the reason for that deference.[20]

The prima facie case made by appellants based on statistics and counsel's unpersuasive rationalization for the challenged strikes, particularly of Juror # 061, strongly suggested that the proffered race-neutral explanations were pretextual. It then fell to the trial court, during the third step of the *Batson* analysis, to evaluate whether counsel's peremptory strikes had a discriminatory purpose. The "rigorous scrutiny" required by *Tursio* in these circumstances could have dispelled the taint of pretextuality, further developing the record as the trial court explored counsel's proffered reasons and allowing the trial court to evaluate counsel's credibility.

The statutory right to peremptory challenges coexists, somewhat uneasily, with the constitutional right to equal protection. *See Batson, supra,* 476 U.S. at 102, 106 S.Ct. at 1726, (Marshall, J., concurring). The existence of this obvious tension, and the preeminence of the constitutional right, requires vigilance on the part of the trial courts that evaluate *Batson* challenges in the first instance, and of the appellate courts that review them. Vindication of the right to equal protection is uniquely important where the alleged violation occurs in the courts because, as the Supreme Court has observed:

> [T]he injury caused by the discrimination is made more severe because the government permits it to occur within the courthouse itself. Few places are a more real expression of the constitutional authority of the government than a courtroom,

---

**19.** Trial counsel specifically identified inconsistencies in the treatment of Juror # 061 when compared to Juror # 862, discussed above, and of Juror # 800, who is not African–American, when compared with Jurors # 668 and # 747, who are African–Americans. On appeal, we are directed to further inconsistencies between the explanations proffered for striking Jurors # 800 and # 494. We do not rely on these inconsistencies in concluding that the trial court should have applied a stricter scrutiny because trial counsel did not specifically point them out to the trial judge. However, it is likely that the inconsistencies would have come to the trial court's attention had the strike of Juror # 061 been viewed in the context of the jury selection as a whole. In any event, "[t]he exclusion of even one ... member of the venire for racial reasons violates the equal protection clause." *Little, supra,* 613 A.2d at 885.

**20.** As Judge Schwelb states in his separate concurrence, *post* at 772, in the important area of *Batson* challenges we "cannot simply rubber stamp the judge's findings."

where the law itself unfolds. Within the courtroom, the government invokes its laws to determine the rights of those who stand before it. In full view of the public, litigants press their cases, witnesses give testimony, juries render verdicts, and *judges act with the utmost care* to ensure that justice is done.

Race discrimination within the courtroom raises serious questions as to the fairness of the proceedings conducted there. Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality. *Rose v. Mitchell,* 443 U.S. 545, 556 [99 S.Ct. 2993, 3000, 61 L.Ed.2d 739] (1979); *Smith v. Texas,* 311 U.S. 128, 130 [61 S.Ct. 164, 165, 85 L.Ed. 84] (1940). In the many times we have addressed the problem of racial bias in our system of justice, we have not "questioned the premise that racial discrimination in the qualification or selection of jurors offends the dignity of persons and the integrity of the courts." *Powers [v. Ohio]* 499 U.S. [400,] at 401 [111 S.Ct. 1364, 1365, 113 L.Ed.2d 411 (1991)] [ (1991) ]. To permit racial exclusion in this official forum compounds the racial insult inherent in judging a citizen by the color of his or·her skin.

*Edmonson, supra,* 500 U.S. at 628, 111 S.Ct. at 2087 (emphasis added).

In the absence of appropriate judicial scrutiny, we are presented with a very slim record. On the evidence of record before us, consisting of strong statistics supporting a conclusion of impermissible discrimination and weak race-neutral reasons for the challenged strikes, the trial court failed to apply all the relevant principles. Accordingly, the judgment is reversed and the case is remanded for further evaluation by the trial court.[21]

### III.

There is one evidentiary issue raised on appeal that might come up at a new trial.[22] Appellants claim that the trial court erred in allowing Baucom to testify about hearsay statements, made by an unnamed individual, that decedent's treatment at the Hospital "was not right." The Hospital objected to questioning involving Baucom's conversation with a nurse who Baucom claimed treated her grandmother at the Hospital. After an in-depth bench conference, the trial judge allowed Baucom to testify about the absent nurse's statement under the hearsay exception for admissions made by a party's employee, pursuant to *District of Columbia v. Washington,* 332 A.2d 347 (D.C.1975). The trial judge considered the Hospital's objection that there was a "certain amount of ambiguity as to who said it," and whether the woman who made the statement was an employee of the Hospital or even had the expertise to make such a statement. The trial court admitted the statement with the condition that Baucom's counsel would not argue to the jury that the nurse was recognizing liability.

Appellants argue that *Washington* is distinguishable from this case because in *Washington* the out-of-court declarant was identified by name and position. Instead, appellants argue, this case is controlled by *Pratt v. District of Columbia,* 407 A.2d 612 (D.C.1979). We conclude that *Pratt* is not dispositive. In *Pratt,* the out-of-court declarant was not identified and information from which the out-of-court declarant could be identified was not provided. *Id.* at 616. In those circumstances, we concluded the evidence to be insufficient to establish that the declarant was an employee of a party speaking on a subject within the declarant's scope of employment. *Id.* However, in this case, unlike *Pratt,* Baucom submitted hospital records of all nurses who treated the

---

21. Although the case is being returned to the trial court to develop further the record and make more specific findings of fact and conclusions of law, it may be impracticable to do so years after the fact. Moreover, the value of an on-the-spot exploration of counsel's motives, including the trial court's opportunity to assess counsel's candor, is likely to be significantly diminished once the appellate court has set out its difficulties with the explanations already given. It is for the trial court, in the first instance, to determine the viability of a remand, or declare a mistrial.

22. The other evidentiary issues raised on appeal are not addressed because they are unlikely to arise in the same context in a retrial.

decedent and established at pre-trial depositions the approximate time the statement was made. We find that the concern in *Pratt* was significantly lessened in this case because the Hospital was given information from which it could have identified the out-of-court declarant. It is anomalous that even though the trial court admitted the statement under the hearsay exception for admissions of a party, the trial court did not allow the statement to be used as an admission of liability, but as evidence of negligence, without first establishing the declarant's competence to opine on the standard of care. In light of the limited purpose for which the statement was admitted and the ample testimony showing appellant's negligence, however, the statement was not unduly prejudicial. *See McIntyre v. United States*, 634 A.2d 940, 945 (D.C.1993). Therefore, the trial court did not abuse its discretion by allowing the absent nurse's statement into evidence.

SCHWELB, Associate Judge, concurring: I agree that we cannot sustain the trial judge's disposition of the defendants' *Batson*[1] claim. I write separately, however, because my reasons differ, at least in emphasis, from those articulated by Judge Ruiz.[2]

## I.

### STATISTICS

#### A. *General observations.*

Judge Ruiz states that the trial judge erred in "entirely" discounting the statistical evidence. I would go further. This record reveals a high statistical probability that the plaintiff struck one or more potential jurors on account of race. In my opinion, the trial judge's failure to include the statistical evi-

dence in his calculus undermined his *Batson* analysis.

The trial judge recognized that a prima facie case can be made under *Batson* by proving a "disparate impact or result due to numbers," but he "[did] not think that the numbers here permit that because they are so small." The judge acknowledged that the jury, as finally constituted, was all-black. He stated, however, that "the venire itself was 95% black to begin with, [s]o it's not surprising that you have [only] African American jurors."[3] The judge apparently found it irrelevant that even though non-black jurors represented only a small percentage of the venire, *all* of Ms. Baucom's strikes were directed at non-blacks, and *no* non-black juror was left in the box when plaintiff's counsel had completed his work.

#### B. *The parties' peremptory challenges.*

After the judge had ruled on the parties' challenges for cause, he placed eight jurors in the jury box, and counsel were directed to exercise their peremptory challenges. Each side had three strikes. In order to enable the reader to understand exactly how these strikes were used, I attempt to reproduce below the situation at each stage of the process.

The following table reflects the number and race of each person in the jury box before the first round of challenges:

| Seat | Juror Number | Race |
|------|-------------|------|
| 1 | 61 | W |
| 2 | 494 | W |
| 3 | 578 | B |
| 4 | 668 | B |
| 5 | 669 | B |
| 6 | 735 | B |
| 7 | 747 | B |
| 8 | 800 | B [4] |

---

1. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. I agree with Judge Ruiz' disposition, in Part III of her opinion, of the evidentiary issues raised by the appellants.

3. Actually, of the fourteen jurors who reached the jury box during the selection process, eleven (78%) were black and three (22%) were non-black.

4. Juror No. 800 was of Hispanic origin. Counsel for the hospital claimed that she was also white. Because the alleged discrimination in the present case was between blacks and non-blacks, and because Juror No. 800 was not black, it makes no difference whether or not Juror No. 800 was technically white.

At the beginning of the proceedings, there were thus five black jurors and three non-blacks seated in the box.

In the first round of strikes, plaintiff peremptorily challenged Juror No. 61 (white) in Seat 1. The defense struck Juror No. 747 (black) in Seat 7. The two jurors who were struck were replaced respectively by Juror No. 820 (black) in Seat 1 and Juror No. 836 (black) in Seat 7. As a result, there were now six blacks and two non-blacks in the jury box:

| Seat | Juror Number | Race |
|------|------|------|
| 1 | 820 | B |
| 2 | 494 | W |
| 3 | 578 | B |
| 4 | 668 | B |
| 5 | 669 | B |
| 6 | 735 | B |
| 7 | 836 | B |
| 8 | 800 | H |

In the second round, the plaintiff peremptorily challenged Juror No. 494 (white) in Seat 2. The defense challenged Juror No. 820 (black) in Seat 1. This left only one non-black juror in the box:

| Seat | Juror Number | Race |
|------|------|------|
| 1 | 845 | B |
| 2 | 862 | B |
| 3 | 578 | B |
| 4 | 668 | B |
| 5 | 669 | B |
| 6 | 735 | B |
| 7 | 747 | B |
| 8 | 800 | H |

In the third and final round, the plaintiff struck Juror No. 800 (Hispanic) in Seat 8. The defense challenged Juror No. 735 in Seat 6. Both of these individuals were replaced by black jurors, No. 894 in Seat 6 and No. 20 in Seat 8. The composition of the jury box was now as follows:

| Seat | Juror Number | Race |
|------|------|------|
| 1 | 845 | B |
| 2 | 862 | B |
| 3 | 578 | B |
| 4 | 668 | B |
| 5 | 669 | B |
| 6 | 894 | B |
| 7 | 747 | B |
| 8 | 20 | B |

The aggregate effect of the plaintiff's strikes can best be discerned from the following combination of the four previous tables:

| | Race before 1st round | Race after 2nd round | Race after 3rd round | Race after 3rd round |
|---|---|---|---|---|
| 1 | W | B | B | B |
| 2 | W | W | B | B |
| 3 | B | B | B | B |
| 4 | B | B | B | B |
| 5 | B | B | B | B |
| 6 | B | B | B | B |
| 7 | B | B | B | B |
| 8 | H | H | H | B |

The changes in the composition of the jury, round by round, reveal graphically exactly what occurred. In successive rounds, counsel for plaintiff moved from Seat 1 to Seat 2 to Seat 8, striking from the jury each non-black individual in the box. When he had finished, all eight jurors who remained were black.

C. *Probability.*

From a statistical perspective, the possibility is remote that the selection of this uniracial jury happened by chance.

When Ms. Baucom's counsel exercised his first strike, there were five black jurors and three non-black jurors seated in the box. If the first peremptory challenge had been exercised at random—if, by analogy, five black balls and three white balls had been placed in a bag, and if a single ball had been extracted "blind"—then there would have been a 3/8 chance that the person struck (or the ball extracted) would be non-black. Obviously, no inference of discrimination could reasonably be drawn solely from the fact that the first juror struck by the plaintiff was white.

During the second round, there were two non-blacks and six blacks in the box. Ms. Baucom's attorney again challenged a non-black juror. If race had not been a factor—if, *e.g.*, there had been a blind drawing—then the probability that a non-black juror would be struck was one in four. If the strikes both in the first round and in the second round had been conducted at random, however—if each round had consisted of pulling balls from a bag—then the probability that a

non-black juror would be peremptorily challenged in both rounds was 3/8 × 1/4, or 3/32; *i.e.*, less than one in ten. See RICHARD A. WEHMHOEFER, STATISTICS IN LITIGATION § 3.05, at 41 (1985).

In the third round, Juror No. 800 (Hispanic) was the only non-black juror remaining in the box, and Ms. Baucom's attorney exercised his remaining peremptory challenge to strike her. The chance that Juror No. 800 would be struck at random, if race was not a factor, was one in eight. The probability that a non-black juror would be struck in each of the three rounds, however, was 3/32 × 1/8, or 3/256. *Id.* Accordingly, if race had been eliminated as a factor—if there had been three "blind" drawings from a bag— there would have been less than a 1/85 chance that all of the plaintiff's strikes would be directed at non-black jurors. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Tursio v. United States,* 634 A.2d 1205, 1213 (D.C. 1993) (quoting *Poulnot v. District of Columbia,* 608 A.2d 134, 139 (D.C.1992)).[5]

### D. *Legal analysis.*

"In the problem of racial discrimination, statistics often tell much, and courts listen." *Tursio, supra,* 634 A.2d at 1213 (quoting *Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625, 632 (D.C. 1989)). "Nothing is as emphatic as zero." *Tursio,* 634 A.2d at 1210 (quoting *United States v. Hinds County School Bd.,* 417 F.2d 852, 858 (5th Cir.1969) (per curiam), *cert. denied,* 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970)). Moreover, there is "no acceptable place in the law for partial racial discrimination," *Tursio,* 634 A.2d at 1213 n. 7 (quoting *Smith v. Sol D. Adler Realty Co.,* 436 F.2d 344, 350 (7th Cir.1970)), and a peremptory challenge may not be based in part

on the juror's race, even if counsel was motivated in part by some legitimate nondiscriminatory factor. Here, all of the plaintiff's strikes were of non-blacks, and the number of non-blacks left on the jury was zero. To believe that the race of the jurors played no role whatever in jury selection in this case is to attribute to coincidence that for which there is a far more plausible explanation. *See Nelson v. United States,* 649 A.2d 301, 312–13 (D.C.1994) (concurring opinion).

I do not suggest that statistical improbability cannot be rebutted. Statistics such as those here presented, however, are something that the trier of fact is obligated to take into account. *Tursio, supra,* 634 A.2d at 1213. Common sense tells us why. If a witness were to testify that when he went to a local supermarket, all thirty of the customers in the store were more than seven feet tall, then most rational people would react to his tale with a measure of skepticism. His account *could* be true—there are doubtless more than thirty people in Washington, D.C. who could call Wilt Chamberlain "Shorty"— but the improbability that everyone in the store was as tall as that is obviously relevant to the credibility of the narrator and of the narrative. To ignore this is to ignore reality.

The present case likewise required the trier of fact to adopt a "show me" attitude with respect to the explanations provided by counsel for plaintiff. The judge was confronted with a series of events which pointed strongly to the probability that race was a significant factor in what had occurred. The judge saw it all happen; the plaintiff removed one non-black juror after the next from the jury box, until all three were gone. When Ms. Baucom's attorney assured the judge that his strikes were not based on race, then an effective assessment of the credibility of that assurance surely required the judge to in-

---

**5.** Chief Judge Wagner points out that "individuals, unlike marbles, which differ only in size and color, possess unique attributes and experiences which may bear upon their ability to render a fair and impartial verdict in certain cases." I certainly agree; jurors, like people in all walks of life, should be selected on the basis of individual qualifications, and not in order to satisfy some preordained racial grid. But where, as here, choices ostensibly made on the basis of legiti-

mate and nondiscriminatory factors turn out in practice to disqualify, exclusively or almost exclusively, members of one race, and where the result is a work force, or a tenant population, or, as here, a jury, which is composed exclusively of members of a different race, we would surely be foolhardy to ascribe it all to coincidence without first adopting an attitude of open-minded skepticism and then taking a good hard look.

clude in his calculus the obvious fact that, if what counsel was saying was true, then a remarkable and statistically improbable coincidence had occurred.

## II.

## THE RACIALLY NEUTRAL JUSTIFICATIONS

The statistical evidence which I have described above is persuasive and, in my view, sufficient to establish a prima facie case. *See Tursio, supra*, 634 A.2d at 1210–11; *cf. United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir.1991) ("a challenge rate nearly twice the likely minority percentage of the venire strongly supports a prima facie case under *Batson* "). The statistics are not conclusive, however. Once a prima facie case has been established, the burden shifts to the opposing party to provide a racially neutral explanation for the strikes. *Batson, supra*, 476 U.S. at 96, 106 S.Ct. at 1722–23; *Nelson, supra*, 649 A.2d at 310. The next question to be addressed is whether Ms. Baucom effectively provided a sufficient nondiscriminatory explanation.

Like Judge Ruiz, I focus in this connection on the issues relating to Juror No. 61.[6] The defense case was directed primarily to the plaintiff's strike of this juror, and the relief requested in the trial court was that Juror No. 61 be seated. If the defendants cannot prove that discrimination occurred with respect to the peremptory challenge of this juror, it is unlikely that they can prevail at all.

Plaintiff's counsel told the court that he did not strike Juror No. 61 because of her race, but because

> looking at her, she is young number 1 and I don't believe from the Plaintiff's perspective, I don't believe that she would be able to relate to the ability of a 75–year–old lady to ambulate after having suffered a stroke.
>
> Number 2, the employment is the Greenpeace Development and I looked at

the employment as Greenpeace as being something of a liberal nature and I am not interested in having somebody that works for Greenpeace on this jury.

Each of the justifications provided by counsel is sufficient to meet the requirements of Step 2 of *Batson*. Age is racially neutral, and we have held that a party is not constitutionally precluded from basing a peremptory strike on a juror's age. *Baxter v. United States*, 640 A.2d 714, 718 n. 5 (D.C.1994). Although the "Greenpeace liberal" justification is a little more dubious, "the second step of [the *Batson* ] process does not demand an explanation that is persuasive *or even plausible.*" *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam) (emphasis added). Indeed, "a legitimate reason is not a reason that makes sense, but a reason that does not deny equal protection." *Id.* The plaintiff having presented ostensibly nondiscriminatory justifications for her strikes, the burden was on the defendants to establish that these justifications were pretextual and that Ms. Baucom's counsel purposely exercised his peremptory challenges in a racially discriminatory manner.

## III.

## PRETEXTUALITY

To determine whether the defendants demonstrated pretextuality, we must first consider the trial judge's findings. After sustaining as nondiscriminatory the plaintiff's challenges to Juror No. 494 and to Juror No. 800, the judge expressed reservations regarding counsel's stated reasons for striking Juror No. 61, but he ultimately found no discrimination:

> Now with respect to 061, I don't think that I find Mr. Costello's[7] explanation completely or immediately persuasive.
>
> Her identification, her occupational identification and I don't understand how someone employed at GreenPeace, and let's assume that they are described as being liberal or they are liberal as the

---

6. Absent the statistical pattern, I would find quite unpersuasive the evidence that the other two non-black jurors were struck because of race.

7. John F.Y. Costello, Esq. represented Ms. Baucom both at trial and on appeal.

term is used here, but I don't know how exactly that according to his calculations and I suppose that it's possible that he would—that he has a view that someone associated with that organization might have some view about nature taking its course and the survival of the fittest or that it's wrong to lavish too many resources on old people or in keeping them in good shape or whatever and that may be his reason behind it.

But, putting that to one side, it seems to me that the explanation about her age that Counsel is willing to strike her if he finds that he would like to have the jury persuaded as much as possible toward the older set rather than the younger set.

Counsel, I find that strike to be understandable.

The judge's assessment is not to be lightly set aside. "We accord the trial court's findings on the issue of discriminatory intent deference, since they turn in large measure on an evaluation of credibility." *Nelson, supra,* 649 A.2d at 312. But exculpatory prevarication is an integral part of the discriminator's *modus operandi,* and trial judges should be careful not to ignore the size of Pinocchio's nose. Especially where, as here, the right to equal opportunity is at issue, an appellate court cannot simply rubber stamp the judge's findings. If those findings have been induced by a misapprehension of controlling substantive legal principles, then they lose the insulation of the "clearly erroneous" rule set forth in Super.Ct.Civ.R. 52(a). *See, e.g., Murphy v. McCloud,* 650 A.2d 202, 210 (D.C.1994).

With these principles in mind, I address the explanation provided by plaintiff's counsel for striking Juror No. 61. The first justification—that, at the age of 26, this juror was too young—was not invoked against a similarly situated black woman, albeit in a later round. As Judge Ruiz points out, Ms. Baucom's attorney subsequently passed up the opportunity to strike Juror No. 862, who was also 26 years old, female, and black. Although counsel claimed at trial that he had no more strikes left by the time Juror No.

862 was seated, this contention is incorrect. Juror No. 862 was placed in the box after the second round of strikes, and was a potential strike during the third round.[8] See pp. 768, 769, *supra.* Obviously, age was not a factor of *decisive* importance to plaintiff's counsel.

Counsel's other stated reason for striking Juror No. 61 was her employment with Greenpeace and her perceived liberal tendencies. The attorney for the hospital responded to this justification by remarking that this was "the first time I ever heard a plaintiff's attorney indicate that a liberal individual is someone that a plaintiff would not have seated on the case." It is difficult to disagree with counsel's point. Indeed, the trial judge, as we have seen, expressed his own skepticism about this rather unusual justification provided by an attorney for *the plaintiff* in a medical malpractice action.

In sum, we have before us a situation in which *all* of the plaintiff's strikes were directed at non-blacks, who represented a small minority of the jurors seated in the box. The resulting jury was all black. The odds against this occurring by chance are steep, and the judge was therefore obliged to scrutinize critically counsel's stated explanations. If the judge had done so, and if he had not excluded meaningful and highly probative statistics from his calculus, he might well have reached a different result.

In *Purkett,* the Supreme Court recognized that during the *Batson* step 3 pretextuality inquiry "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." 514 U.S. at 767–69, 115 S.Ct. at 1771. That may well be what we have here. Nothing is as emphatic as zero. Zero blacks were challenged by plaintiff. Zero was the number of non-blacks left on the jury. The statistics here are thus especially emphatic, and courts are supposed to listen. *Tursio, supra,* 634 A.2d at 1210. Considering the plural zeros together with the unpersuasiveness of the "Greenpeace liberal" explanation, I apprehend that the trial judge's finding that there

---

8. As Chief Judge Wagner correctly points out, however, some of the jurors who were in the box in the third round had not yet been seated during the first round.

was no *Batson* violation was induced by the application of an incorrect legal standard, *see Murphy, supra,* 650 A.2d at 210, in that the judge erroneously excluded from his calculus some relevant and persuasive evidence. A remand for new findings is therefore required. If the judge is still able to make these findings after the passage of so much time, then he should do so; if not, then he should order a new trial.

## IV.

## "PROBING" AND PLAIN ERROR

Counsel for Dr. Trowell's estate contends that the trial judge erred by failing to interrogate Ms. Baucom's attorney and to demand further explanation of his strikes. An examination of the record persuades me that any such point was waived.

At the conclusion of the *Batson* hearing in this case, the trial judge indicated that the defense had not proved discrimination in the plaintiff's exercise of her peremptory challenges. The following colloquy ensued:

> THE COURT: Well, if there is nothing else. . . .
>
> COUNSEL FOR THE HOSPITAL: Nothing else.
>
> COUNSEL FOR DR. TROWELL'S ESTATE: Nothing further.

Neither at this point nor at any earlier time during the hearing did either defense attorney ask the judge to propound questions to Ms. Baucom's counsel or to "probe" counsel's explanations in any other way. To paraphrase *Hunter v. United States,* 606 A.2d 139, 144 (D.C.1992), *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1993):

> Litigants should not be permitted to keep some of their [demands] in their hip pockets and to disclose them only to the appellate tribunal; "[o]ne cannot take his chance on a favorable verdict, reserving a right to impeach it if it happens to go the other way." *Palmer Constr. Co. v. Patouillet,* 42 A.2d 273, 274 (D.C. [Mun.App.] 1945); *see also Hopkins v. United States,* 595 A.2d 995, 996 n. 3 (D.C.1991) (quoting *Patouillet* ).

We recently held in *In re A.R.,* 679 A.2d 470 (D.C.1996), an appeal from an order terminating parental rights, that the appellant father could not be heard to complain in this court that the judge had failed to call or to interrogate certain witnesses, where the father had not requested the judge at trial to call or interrogate them. *Id.* at 477–78 & n. 11. The present case is identical in principle to *In re A.R.*

Counsel for Dr. Trowell's estate cites *Tursio, supra,* for the proposition that the judge erred in this case by not "probing" further. We stated in *Tursio* that

> [a]ppellant's prima facie showing of discrimination here was so compelling that the trial court should have probed the prosecutor in detail about his different treatment of similarly situated jurors.

634 A.2d at 1213. We so concluded, in part, "because the trial court, *despite a strong, clear, and timely defense request,* did not conduct a sufficient inquiry. . . ." *Id.* (Emphasis added.) As a member of the division which decided *Tursio,* I certainly did not intend either to fashion or to countenance a departure from one of the most fundamental principles of the appellate process:

> In our jurisprudential system, trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort. Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal.

*Miller v. Avirom,* 127 U.S.App.D.C. 367, 369, 384 F.2d 319, 321 (1967); *see also D.D. v. M.T.,* 550 A.2d 37, 48 (D.C.1988) (quoting *Miller* ).

Counsel for the defendants had ample opportunity in this case to ask the judge to pose additional questions to Ms. Baucom's attorney. Having failed to avail themselves of that opportunity, they cannot now be heard to complain that the trial judge's interrogation was insufficient or deficient.

## V.

## CONCLUSION

We are presented here with an unfortunate situation. The plaintiff presented substantial evidence of negligent conduct on the part of the defendants. The case may now have to be retried. Retrials are expensive and burdensome, to the parties and to the judicial system. This litigation did not present a racial controversy, and it may well be that the plaintiff's *Batson* violation did not affect the substantive result at all.

Those of us who sat on the trial court before *Batson* and its progeny [9] observed, in all too many cases, the striking by counsel of jurors of a particular race, one by one, until the jury consisted entirely or almost entirely of persons of one race. *Batson* was supposed to proscribe this kind of discriminatory practice, but the bad old ways die hard. *See, e.g., Tursio* and *Nelson*.[10] The time has now come to put an end to this unwanted vestige of an era that should have been consigned to oblivion long ago.[11] Where, as here, a step-by-step racial purge of the jury-box was effected, judges should take explanations like "Greenpeace liberal" with more than a single grain of salt.

WAGNER, Chief Judge, dissenting:

The command of *Batson* and its progeny is to eliminate the use of peremptory challenges in an unconstitutional manner, not to deprive a party of legitimate, case-based, non-discriminatory reasons for striking potential jurors. *Batson v. Kentucky,* 476 U.S. 79, 85–86, 106 S.Ct. 1712, 1716–18, 90 L.Ed.2d 69 (1986). The majority's holding succeeds in accomplishing only the latter. The record simply does not support the conclusion that the trial court clearly erred in

determining that counsel for the representative of Mrs. Baucom's estate (the estate) did not engage in purposeful discrimination in exercising its peremptory strikes. *See Purkett v. Elem,* 514 U.S. 765, 767–69, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (burden of proving purposeful discrimination rests with the opponent of the strike) (citation omitted). Rather, the record supports the trial court's ruling that the estate's reasons for exercising its peremptory challenges were legitimate ones which do not infringe equal protection. *See id.*

In this medical negligence case against a hospital and physician, counsel for the estate exercised two of its three peremptory challenges to exclude from the jury two members of the venire whom he had challenged unsuccessfully for cause. One (juror 494) was vice-president of a management company, whose clients for the past twenty-five years had "all been hospitals and physician organizations" and who stated that she had "a stronger understanding of the issues that surround hospitals and physicians in today's environment." Indeed, she said that, because of her experience, she "would err on the side of understanding the issues that would surround hospitals or physicians." When probed about her ability to put aside her experiences in deciding the case, some reservation was implicit in her answer, as she stated more than once only that she would "endeavor" to do so. However, she acknowledged candidly that she had a "basis of knowledge which [she had had] for a long time," and that "[t]he degree to which that would prejudice me, I am not sure." Understandably, competent counsel would not want one with such experiences, and probable predispositions, to resolve his client's claim against a hospital and physician. Neverthe-

---

9. The Supreme Court held in *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 618–28, 111 S.Ct. 2077, 2081–87, 114 L.Ed.2d 660 (1991), that the Constitution proscribes racially based peremptory strikes in civil cases as well as in criminal prosecutions. *See also Georgia v. McCollum,* 505 U.S. 42, 48–55, 112 S.Ct. 2348, 2353–57, 120 L.Ed.2d 33 (1992), applying *Batson* to peremptory challenges by the defense in criminal cases.

10. In *Nelson,* for all practical purposes, the prosecution struck only men and the defense challenged only women.

11. At least one trial court judge makes a constructive attempt to inhibit *Batson* violations by advising the members of the venire, as a part of the explanation of the peremptory challenge process, that counsel are permitted to strike prospective jurors for any reason, except that discrimination based, *e.g.,* on race or sex is prohibited.

less, the court denied the estate's motion to strike this juror for cause, and the estate's attorney used a peremptory challenge to exclude her.

The other venire member challenged initially by the estate for cause was a nurse (juror 800) and the director of a health clinic, who had specialized knowledge concerning one of the issues central to the estate's negligence claim. Counsel for the estate argued for her dismissal for cause because of her awareness of the standard of care involved and a realistic assessment that one with such specialized knowledge might have difficulty separating it from the evidence presented at trial. In arguing that juror 800 should be stricken for cause, counsel explained:

> Given that's the only real issue in this case and there will be a serious debate about that issue, I don't think that we should have any "expert jurors" sitting on the jury putting forth their own positions and perhaps formulating the facts of the case to their own expert opinion and I would challenge her for cause.

Again, the trial court rejected the challenge for cause, but expressed its own opinion that "[s]he may be a very attractive candidate for a peremptory." Not surprisingly, counsel exercised a peremptory strike against her. Subsequently, during the *Batson* inquiry, the estate's attorney offered the very same reasons for striking juror number 800 as he had before it became the subject of a *Batson* challenge.

> Your Honor, the reason that I struck her, Juror Number 800, is because she is a nurse and she has had training on the issue of the application of Posey restraints and she works within the medical field. Judge, I was concerned that she would utilize her own training and skill and substitute that for the Plaintiff's experts in this case.

Counsel's concern had a reasonable basis in the record. One of the claims of negligence was that the hospital and Dr. Trowell breached the standard of care in failing to order the use of a "posey" restraint to prevent ambulation by the decedent, Mrs. Baucom, which proximately resulted in her fall and injuries. Juror 800, the nurse, had stated during voir dire that whether posey restraints should be applied was a question being debated at the time that she did her training and that she continued to work in the medical-surgical field. Juror 800 was unique among the venire members in having both a management position at a health care facility and an exposure to the controversy surrounding the use of posey restraints.

While the estate's reasons for exercising its third peremptory strike to eliminate juror 061 were not as compelling as its reasons for the other two, they were nevertheless, as the trial court found, legitimate, non-discriminatory ones. The estate's attorney explained that he struck juror 061, a twenty-six year-old woman, because of concern that she would not be able "to relate to the ability of a 75–year–old lady [Mrs. Baucom], to ambulate after having suffered a stroke" and because, in his opinion, her employment suggested "a liberal nature" which he preferred not to have on the jury.[1] Strikes based upon youth and employment have been determined to be constitutionally permissible. *See Baxter v. United States*, 640 A.2d 714, 718 n. 5 (D.C. 1994) (citations omitted); *see also Nelson v. United States*, 649 A.2d 301, 311 n. 13 (D.C. 1994) (citing *United States v. Ferguson*, 935 F.2d 862, 865 (7th Cir.1991), *cert. denied*, 502 U.S. 1045, 112 S.Ct. 907, 116 L.Ed.2d 807 (1992) and *United States v. Romero–Reyna*, 889 F.2d 559, 562 (5th Cir.1989), *cert. denied*, 494 U.S. 1084, 110 S.Ct. 1818, 108 L.Ed.2d 948 (1990)).

Contrary to the trial court's findings, my colleagues find that the reasons given with respect to juror 061 were pretextual, primarily because of the estate's failure to strike a 26–year–old black female (juror 862). The fallacy in this argument is that juror 061 was among the first jurors seated and the first to be stricken, while juror 862 was not called into the box until the last round of strikes.

---

1. The estate's counsel also offered that the manner in which juror 061 responded to questions entered into his decision to strike her. Such a reason is also neutral and does not offend equal protection. *See Purkett v. Elem, supra,* 514 U.S. at 769, 115 S.Ct. at 1771 ("A 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection.").

Therefore, 061 and 862 were not the subject of comparison at that point.[2] My colleagues take the position that the challenge to 061 because of her age was not applied even-handedly because 862 was not stricken for the same reason. Essentially, this means that the estate should have stricken 862 for her youth in lieu of juror 800. This argument ignores the unique experiences of juror 800 and the plausible reasons which suggested that her experience might interfere with her ability to perform properly her duties as a juror. As stated previously, juror 800 was the nurse, who ran a medical clinic and who had knowledge of the debate surrounding the application of posey restraints, which was the subject of the estate's negligence claim[3] In light of the compelling reason for striking juror 800 and the order in which the strikes were made, it is not unreasonable for the trial court to have found no pretext for the strikes. The trial court's findings of whether a party intentionally discriminates in exercising peremptory challenges turns largely on an evaluation of credibility, and we accord great deference to the trial court in reviewing those findings. *Batson, supra,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1721 n. 21; *see also Jefferson v. United States,* 631 A.2d 13, 17 (D.C.1993) (citations omitted); *Little v. United States,* 613 A.2d 880, 885 (D.C.1992) (citation omitted). The majority fails to accord the trial court's findings the deference due. On this record, it cannot be said fairly that the trial court's finding and determination that the hospital and physician failed to meet their burden of showing purposeful discrimination was clearly erroneous. *See Purkett, supra,* 514 U.S. at 767–69, 115 S.Ct. at 1771 (burden of persuasion regarding racial motivation rests with the opponent of the strikes) (citation omitted).

My colleagues fault the trial court for "discounting the statistical evidence," *i.e.,* that the estate exercised its three peremptory challenges against three whites.[4] Judge Schwelb goes further and concludes that there is "a very high statistical probability indeed that the [estate] struck one or more potential jurors on account of race." The estate had only three strikes to use. The trial court determined essentially that this number was too small to be statistically significant, particularly having considered the other relevant factors, as it was required to do. *See Batson, supra,* 476 U.S. at 96–97, 106 S.Ct. at 1722–23.

This court has stated that "although the trial court may examine statistical disparities as one factor in assessing the *prima facie* case . . . ," an inference of discrimination will not likely arise from a mere showing that the party used all of its peremptory challenges to exclude one race. *Little, supra,* 613 A.2d at 886 (citations omitted). Statistics, standing alone, are inadequate to fathom motive in this context because individuals, unlike marbles, which differ only in size and color, possess unique attributes and experiences which may bear upon their ability to render a fair and impartial verdict in certain cases.[5]

2. In any event, the estate had two objections to 061, age and employment, while there is no showing that 862 had an objectionable employment status. Thus, the two were not similarly situated:

> [W]hen the *Batson* respondents proffer that a *combination* of characteristics provoked the striking of targeted-group members, it is neither fair nor persuasive to reject such explanations because the same characteristics exist singly, and not in the same combination, among accepted jurors.

Kenneth J. Melilli, *Batson in Practice: What We Have Learned about Batson and Peremptory Challenges,* 71 Notre Dame Law Review 447, 480 (1996) (emphasis added).

The concurring opinion suggests that the employment objection should be ignored. However, while questioned by the trial court, the reason was not ignored wholly. The trial court observed:

> I suppose that it's possible that [counsel] would—that he has a view that someone associated with that organization might have some view about nature taking its course and the survival of the fittest or that it's wrong to lavish too many resources on old people or in keeping them in good shape or whatever and that may be his reason behind it.

3. Judge Schwelb appears to recognize that the record does not support a *Batson* challenge to jurors 800 and 494. (See concurring op. p. 771 n. 6.)

4. One of these three venire members has been described as Hispanic.

5. On the facts of this case, and particularly given the unique characteristics of the potential jurors, Judge Schwelb's skepticism about the reasons for the strikes is not warranted.

In *Little*, this court rejected the type of numbers analysis which my colleagues seek to adopt here. 613 A.2d at 886. We stated that "numbers alone are not sufficient either to establish or negate a *prima facie* showing." *Id.* We held that defense counsel had failed to make even a *prima facie* showing of discrimination where "(1) ... the defendant was black and six of seven strikes were directed toward black persons, (2) ... several black persons were struck who had answered no *voir dire* questions at all, and (3) ... the only white person whom the prosecutor struck had answered a question." *Jefferson v. United States*, 631 A.2d 13, 17–18 (D.C.1993) (citing *Little*). The case now before the court, with substantially fewer challenges and a record of *voir dire* examination which offers refutation of any discriminatory purpose, is far stronger for rejection of the challenge than in *Little*. *See Batson, supra*, 476 U.S. at 97, 106 S.Ct. at 1723 (party's statement during *voir dire* may support or refute inference of discriminatory purpose).

The facts of this case are more persuasive in refuting any *prima facie* claim of discriminatory intent than *Tursio v. United States*, 634 A.2d 1205 (D.C.1993), upon which my colleagues rely. In *Tursio*, where the prosecutor struck nine out of ten blacks, we said that "the racially-charged nature of the case itself strengthened appellant's *prima facie* showing." *Id.* at 1210. Closer scrutiny is applied to the claim of race discrimination where the case is racially charged factually. *Evans v. United States*, 682 A.2d 644, 650 (D.C.1996). No such circumstances are claimed to be present here. In *Tursio*, we found that the trial court erred in its consideration of the *Batson* claim for several reasons, including that the court had focused exclusively on the plausibility of each challenge rather than assessing each challenge in the context of the overall case, which the defendant had requested. *Tursio* at 1209, 1211–12. In the present case, counsel for the hospital and physician did not seek to probe beyond the disclosures previously discussed, leaving a record which supports the trial court's finding that they did not meet their burden of showing of purposeful discrimination.

A party's burden in rebutting a *prima facie* case of discrimination in peremptory challenges is not an onerous one. *Little, supra*, 613 A.2d at 888 (citing *Batson, supra*, 476 U.S. at 97–98, 106 S.Ct. at 1723–24). The proponent of the strike must provide a legitimate reason for exercising the strike which is related to the case. *Purkett, supra*, 514 U.S. at 767–69, 115 S.Ct. at 1771 (citations omitted). "What is meant by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Id.* (citation omitted). Seldom do we see a record like the one presented here where the reasons for the strikes are so clearly race-neutral and case related. If counsel cannot strike a juror who is knowledgeable about a central issue in the case, works in the specific field at issue and relates more to the cause of one side than the other, or by reason of youth and employment, in counsel's opinion, may not appreciate fully the circumstances of an elderly woman's claim, then the use of peremptory challenges is effectively barred. The record shows, as the trial court found, that appellants, the opponents of the strikes, failed to meet their ultimate burden of persuasion that the estate's counsel engaged in purposeful discrimination. *See id.* Therefore, I respectfully dissent.