Pedro TURSIO, Appellant,

v.

UNITED STATES, Appellee.

Nos. 91–CF–172 & 91–CF–849.

District of Columbia Court of Appeals.

Argued Oct. 7, 1993.
Decided Dec. 15, 1993.

* Associate Judge Farrell has recused himself from these cases.

David W. Bos, Public Defender Service, with whom James Klein and Jo–Ann Wallace, Public Defender Service, were on the brief, for appellant.

Chrisellen R. Kolb, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, and John R. Fisher and Roy W. McLeese, III, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN and SCHWELB, Associate Judges, and BELSON, Senior Judge.

FERREN, Associate Judge:

Appellant was convicted of second degree murder while armed. D.C.Code §§ 22–2403, –3202 (1989 & Supp.1993). Before the jury was sworn, defense counsel moved for dismissal of the indictment, asserting that the government had used its peremptory challenges in a discriminatory manner violating *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court denied the motion. After trial, defense counsel moved for a new trial on *Batson* grounds in the interests of justice pursuant to Super.Ct.Crim.R. 33. Once again, the court denied the motion, concluding that the original *Batson* motion had not been timely filed. The trial court continued with the hearing, however, electing to decide—in the event it had erred on the timeliness issue—whether the prosecutor had offered sufficient race-neutral reasons to explain his peremptory challenges and thereby rebut what the court found to be a prima facie showing of racial discrimination. The court concluded that the prosecutor had not intentionally struck the jurors because of their race and, therefore, that appellant's constitutional rights under *Batson* had not been violated. We review appeals from the judgment and from the denial of appellant's motion for a new trial. We agree with appellant's *Batson* claim, reverse, and remand for a new trial.

## I.

### Factual Background

Appellant, a Latino[1] man, was charged with second degree murder while armed for stabbing Nathaniel Green, a black man. The stabbing occurred after a fight between Latino and black men at a meal truck line in the Mount Pleasant area. The government's primary witness was Thomas Guiles, a black man, who witnessed the stabbing. Guiles identified appellant two weeks later at another soup kitchen and called the police to arrest him.

Two white women, however, repudiated Guiles's identification testimony. Barbara

---

1. Appellant uses the term "Latino" in his brief. The key fact here, for *Batson* purposes, is that he is not black. Both appellant and appellee use the terms "black" and "white," and we defer to their terminology.

Gottlieb testified that she had seen the assailant when he ran in front of her car. She described the assailant as a Latino man in his upper-thirties, who was heavy-set, several inches taller than she, with shoulder-length, straight black hair. She denied that appellant was the assailant. Susan Kranyik testified that she had seen the assailant from her fourth floor apartment window. Her description of the assailant was similar to the description Gottlieb gave. When asked whether appellant could have been the assailant, Kranyik responded, "[H]e doesn't look at all like the person that I saw that did the stabbing."

*Jury Selection*

The venire from which appellant's jury was selected contained fifty potential jurors. Thirteen were white, and thirty-seven were black. None was Latino. Pursuant to Super.Ct.Crim.R. 24, each side received ten peremptory challenges. The trial court decided to seat two alternate jurors, so the court gave each side one more peremptory strike.

The prosecutor used ten of his peremptory strikes and "passed" on the eleventh. He used nine of the ten to eliminate all the whites from the regular jury. Only one white was left: as an alternate.

After the lunch break but before the jury was sworn, defense counsel moved to dismiss the indictment or, in the alternative, to select a new jury. Counsel asserted that the prosecutor "exercised every single one of his challenges to strike a non-black person from the jury with the possible exception of one person that he struck from the panel" and that this pattern was significant given the racial-ly-charged nature of the case and the different races of the witnesses. The prosecutor responded that defense counsel's contention was "outrageous" and that non-blacks remained on the jury. He commented that some of the police officers in the case were Hispanic and white and that defense counsel had "exercised her challenges to strike every black male but one on the jury panel." [2] The prosecutor then recounted why he had struck two potential jurors. He explained that one juror had expressed concern that the ten years she lived in South America might render her more sympathetic to a Hispanic defendant, and another juror had indicated that she spoke Spanish and might not follow the court interpreter's translation if it interfered with her own understanding.

The trial court denied defense counsel's motion without requesting further explanation from the prosecutor. The court found that the motion was untimely because "no objections were made as the strikes were going on." Furthermore, the court stated that even if the motion were timely, *Batson* did not address striking non-blacks from the jury, and, even if it did, the prosecutor exercised his peremptory challenges for "reasons apart from sheer race." For purposes of the record, the court noted, "The jury of twelve are eleven black women and one black man."

*The Motion for a New Trial*

Defense counsel renewed appellant's *Batson* claim in a motion for a new trial in the interests of justice pursuant to Super.Ct.Crim.R. 33. In the government's written opposition to the motion, the prosecutor provided an account of reasons for each peremptory challenge.[3]

---

2. It is not altogether clear what the defense strategy was in exercising its peremptory strikes, and, in any event, the prosecutor made no *Batson* objections at trial.

3. The reasons the prosecutor gave for his peremptory strikes were as follows:
(1) Juror No. 577: The government was not satisfied with Juror No. 577's ability to be impartial in this case. Juror No. 577 spent the majority of her youth in South America and indicated that she did not know whether that experience would affect her as a juror in deciding the case.
(2) Juror No. 014: The government was not satisfied with Juror No. 014's ability to be impartial in this case. Juror No. 014 indicated that she lived in Central America as a youth and represented Central Americans in [a] pro bono case. Juror No. 014 also indicated that while her Spanish was not perfect, if a Spanish-speaking witness (which potentially included the defendant) testified, she would make her own translation and not defer to the translation given by the official court interpreter.
(3) Juror No. 601: After observing Juror No. 601 and noting her employment, the government made the non-scientific but experienced-taught judgment that Juror No. 601 would be more likely to base her judgment of the guilt or non guilt of the defendant on pure speculation and on sympathy rather than on the facts of

At the hearing, the court corrected a misstatement it had made during the trial: "I would want to eliminate from my ruling the fact that [*Batson*] didn't apply to non-blacks.... I don't think there is any question that *Batson* doesn't only apply to striking black jurors." The court concluded once again that appellant's motion was untimely and that appellant should have raised the issue "before the striking is over, but at a bare minimum before we have excused all the jurors."

Because the court wanted to create a complete record for purposes of appeal, however, the court then assumed that the issue had been timely raised and proceeded to address the merits. The court found that appellant was a white male for purposes of *Batson* and was therefore a member of a cognizable racial group. In addition, the court found that the prosecutor had used nine of ten peremptory challenges to exclude whites from the jury[4] and that defense counsel had established a prima facie showing of racial discrimination under *Batson.*

The trial court then shifted the burden to the prosecutor to explain why the strikes had not been made for a discriminatory purpose. The court noted that the prosecutor had

the case. Additionally, Juror No. 601 appeared reluctant to make eye contact with the prosecutor during jury selection. While this could well be the product of nervousness, it could just as easily have been the product of a predisposition towards the prosecutor and the case.

(4) Juror No. 862: The reasons for striking Juror No. 862 are the same as those for striking Juror No. 601.

(5) Juror No. 950: The government was not satisfied with Juror No. 950's ability to be impartial in this case. Juror No. 950's husband is a lawyer and she therefore may have felt the need to act as a lawyer in the jury room. Furthermore, Juror No. 950 indicated that she had been the victim of violence on at least two occasions which left her very angry at the persons who victimized her and at the police. It was the government's judgment that Juror No. 950's verdict would be based not on the facts of the case, but on the impermissible biases created by her past experiences.

(6) Juror No. 975: The reasons for striking Juror No. 975 were the same as those for striking Juror No. 601. Additionally, Juror No. 975 indicated that a close friend of his was murdered a "couple of years ago" in Mexico City. That juror further indicated that that experience would not have any affect on him as he sat on this homicide case. This was an assertion that the government did not believe. Therefore, it was the judgment of the prosecutor that Juror No. 975 verdict would be based on his past experience—whatever the true nature of that experience be—rather than on the facts of the case.

(7) Juror No. 986: Juror No. 986 "was briefly in law school and left after a few months, and ... [has] a number of friends who are lawyers." The government was not satisfied that Juror No. 986 would not find[] this to be her chance to be the lawyer, judge, or investigator she always wanted to be as opposed to functioning in her proper role as juror.

(8) Juror No. 896: Juror No. 896, a member of the clergy, indicated that he was assaulted on two occasions; and that on one of the occa-

sions charges were dropped because he did not go forward with the case. Juror No. 896 further indicated that he testified in the other assault case where the defendant was found not guilty. This left him with a lot of anger. The government was not satisfied that this juror's verdict would be based on the facts of the case rather than on the impermissible biases created by his past experiences.

(9) Juror No. 001: Juror No. 001 indicated that: (i) she was attacked by three individuals in the same neighborhood where the murder in this case took place; (ii) that the year before that assault she was pistol whipped in that same area; (iii) that a [sic] in 1990 the police cordoned off the area because there was a murder and "you could see the body in the street;" and (iv) a close friend of hers witnessed what the juror believed to be a beating which probably resulted in a death in that area. The government was not comfortable that a juror with this background would render a verdict base on the facts of the case as opposed to the impermissible biases created by those experiences.

(10) Juror No. 037: From observing Juror No. 037's and the nature of her employment, the government made the nonscientific but experienced-taught judgment that Juror No. 037 would over-dissect the facts in this case looking for ghosts; and would be more likely to base her judgment of the guilt or non guilt of the defendant on sympathy and pure speculation rather than on the facts of the case.

4. Although defense counsel asserted that the prosecutor had exercised nine of ten peremptory strikes against white jurors, the court could not verify her assertions in the record. The prosecutor only recalled that four of his peremptories had been used against whites. Because the government never objected to defense counsel's assertion and did not supplement the record with evidence to the contrary, the court "operated under the assumption that [the government] used nine of ten strikes to exclude white people."

tried several cases before the court in the last year and that no defendant had ever complained that the prosecutor discriminatorily struck jurors. The court concluded that the prosecutor's explanations sounded logical:

> [H]aving read his explanations, they sound perfectly logical to me. I don't assume he was acting so crudely as to assume that, you know, these white people would be bad because they were white. This was very much a reasonable doubt case. I think as a general matter more educated people take reasonable doubt more seriously than uneducated people. It is less of a gut thing. He could very legitimately not have wanted very educated people there. Some of the white people that were struck were in that category.

Defense counsel argued that the prosecutor never had asserted that education level was a reason for his strikes, and the court responded:

> The point is I don't have any reason to disbelieve him. What you are saying to me is that on its face, because of the numbers, that I shouldn't accept what he says. What I am saying is that I have no reason not to accept what he says, even in the face of the numbers, and that he could have had a whole host of reasons of which he has set forth for each juror why he struck them, and I see no reason to disbelieve that.

Defense counsel asked for the opportunity to probe the prosecutor's explanations to show that his reasons were facially inadequate and that they were pretextual because similarly situated persons were treated differently. Specifically, defense counsel noted that the prosecutor allegedly struck juror 862 because of her employment as a hospital worker, but he did not strike two black jurors who also worked in hospitals. Furthermore, the prosecutor allegedly struck jurors 950 and 986 because they had friends or relatives who were lawyers; however, a black juror, who also responded that she had a lawyer friend, remained on the panel. In addition, the prosecutor allegedly struck jurors 896, 950, and 975 because they were victims of violence. The prosecutor, however, did not strike two black jurors even though they also were victims of violence. Defense counsel summarized: "Obviously the difference[s] between people who made it onto the jury and the people that [the prosecutor] struck in each of these instances were people he struck were white, and the people that were on the jury were black." She argued that if this trial had occurred in the South, and the races of the parties were reversed, a court would not accept the prosecutor's explanations.

The court agreed that there would be more reason to doubt the prosecutor's explanations if jury selection had taken place in the South, where there is a history of racially-motivated strikes. The court stated:

> [A]n eyebrow would go up if we were down South and that was what was going on.... I just don't think in this city, while I mentioned earlier there are certain tensions in the community, but to assume any certain individual will be biased is a great leap here. If I am attributing motives to [the prosecutor], it is just not logical that he is going to sit here and assume that the black person will be biased in their approach or that the white person will be biased the other way.

The court noted that peremptory strikes are "necessarily impressionistic" and "any impressionistic sort of strike has to consciously or unconsciously take into account the person's race." The court concluded, "I don't think [race] was the motivation for the strikes or that they were in any way discriminatorily intended, and therefore I will find that there is no violation of the Constitution under the *Batson* case."

## II.

■ Although *Batson* does not address the timeliness issue—*i.e.,* when an objection to the jury selection process must be raised—we conclude that a *Batson* motion will be timely when made at any time before the jury is sworn. *See Ford v. Georgia,* 498 U.S. 411, 422, 111 S.Ct. 850, 856, 112 L.Ed.2d 935 (1991);[5] *Hill v. State,* 259 Ga. 557, 385

---

5. According to *Ford,* "[t]he requirement that any *Batson* claim be raised not only before trial, but

S.E.2d 404, 405 (1989) (*Batson* claim should be raised before jurors are sworn); *People v. Evans,* 125 Ill.2d 50, 125 Ill.Dec. 790, 794, 530 N.E.2d 1360, 1364 (1988) (same), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989); *Simmons v. Commonwealth,* 746 S.W.2d 393, 398 (Ky.1988) (same), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1328, 103 L.Ed.2d 596 (1989); *Saffold v. State,* 536 So.2d 970, 971 (Ala.Crim.App.1988) (same); *see also State v. Jones,* 293 S.C. 54, 358 S.E.2d 701, 704 (1987) (*Batson* claim should be made after jury is selected but before it is sworn). It is preferable for counsel to object as soon as a discriminatory pattern emerges so that the selection process can go forward without significantly changing the racial balance of the jury venire; otherwise, voir dire and the lengthy jury selection process may have to be repeated with a new venire. Contemporaneous objections are not always feasible, however, because a pattern of invidious discrimination may not be evident until jury selection is complete. In this case, defense counsel moved to dismiss the indictment, or to select a new jury, before the jury was sworn. Thus, the *Batson* objection was timely, and appellant was entitled to a ruling on the merits.

In *Batson,* the Supreme Court outlined a three-step approach for evaluating whether the prosecutor's use of peremptory challenges violates the Equal Protection Clause:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.

> Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.

> Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York,* 500 U.S. 352, ——, 111 S.Ct. 1859, 1862, 114 L.Ed.2d 395 (1991)

(citing *Batson,* 476 U.S. at 96–98, 106 S.Ct. at 1723–1724).

Although the government does not challenge the trial court's finding that the defense had established a prima facie case, the strength of the prima facie case is obviously relevant in determining the strength of the race-neutral explanations necessary to rebut it. *See Gamble v. State,* 257 Ga. 325, 357 S.E.2d 792, 795 (1987). In this case, statistics, combined with the racially-charged nature of appellant's trial, make the prima facie showing of racially discriminatory strikes quite compelling.

First, the prosecutor used nine of ten peremptory challenges against whites, creating an all-black jury. "Statistics are not, of course, the whole answer but nothing is as emphatic as zero." *United States v. Hinds County Sch. Bd.,* 417 F.2d 852, 858 (5th Cir.1969) (per curiam). These numbers are particularly significant because the prosecutor used ninety percent of his peremptory challenges to strike a group—whites—that constituted only twenty-six percent of the venire.

Second, the racially-charged nature of the case itself strengthened appellant's prima facie showing. Not only were appellant and the victim of different races, but also their altercation arose out of a fight between Latino and black men. Because appellant's defense was misidentification, the government's case turned on whether the jury would find more credible the black witness or the white witnesses. Counsel in this case were also of different races. The prosecutor was black; the defense attorney was white. The trial judge acknowledged the potential for racial bias in this case; he stated that the animus between blacks and Latinos in the District was "the strongest sort of prejudice [he'd] seen in [his] years around here."

A trial court's findings pertaining to purposeful discrimination turn largely on evaluations of credibility and are entitled to great deference. *See Batson,* 476 U.S. at 98 n. 21,

---

in the period between the selection of the jurors and the administration of their oaths, is a sensible rule." 498 U.S. at 422, 111 S.Ct. at 857. In concluding that any *Batson* motion made before the jury is sworn is timely, we do not address the

question whether a *Batson* motion raised after the jury is sworn can also be timely under the circumstances. *See Ford,* 498 U.S. at 423, 111 S.Ct. at 857.

106 S.Ct. at 1724 n. 21. But unless the trial court rigorously scrutinizes the prosecutor's race-neutral explanations, *Batson's* promise of eliminating racial discrimination in jury selection will be an empty one. Although "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause," the prosecutor "must give a 'clear and reasonably specific' explanation of his [or her] 'legitimate reasons' for exercising the challenges." *Batson,* 476 U.S. at 97, 98 n. 20, 106 S.Ct. at 1723, 1724 n. 20. The trial court must then "undertake 'a sensitive inquiry into such circumstantial and direct evidence of [the prosecutor's] intent as may be available.'" *Batson,* 476 U.S. at 93, 106 S.Ct. at 1721 (citing *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977)). In sum, defense counsel's assertion "that the government is acting in a racially discriminatory manner is very serious and demands the closest possible scrutiny." *Jefferson v. United States,* 631 A.2d 13, 15 (D.C.1993).

■ We conclude that the trial court erred in several respects.[6] First, the court should have conducted a full hearing when defense counsel initially raised the *Batson* issue, before the jury was sworn, rather than waiting until the motion for new trial. The court recognized some of the practical difficulties in reconstructing the jury selection process. These difficulties are compounded when months pass between jury selection and the *Batson* hearing. In addition, a prosecutor's explanations will be fresher, and perhaps more candid, if they are given before the prosecutor has time for research and reflection. As it has turned out, however, this delay is of no moment here.

■ Second, we are troubled by the trial court's intimation that, because the prosecutor had previously practiced before the court without being accused of racial discrimination, the prosecutor did not discriminate in this case. This situation can be likened to *Turman v. United States,* 555 A.2d 1037 (D.C.1989), where a trial judge commented

that a witness was credible because he had heard her testify in previous trials and had found her "most credible and most reliable." *Id.* at 1038. This court, as a result, reversed Turman's conviction. Prosecutors in the District frequently practice before the same judge. Although it is perhaps unavoidable that a judge's previous experience with a prosecutor will have some bearing on the judge's assessment of the prosecutor's credibility, the fact that the prosecutor has not been accused of discriminatorily striking jurors in the past is not a part of the record and may not be considered in determining whether he or she is discriminatorily striking jurors in the present.

■ Third, the trial court also stated that "the Deep South venire ... is the real evil that ... *Batson* was focused at" and commented that while heightened scrutiny should be used in a Southern setting with a history of racial discrimination, such heightened scrutiny is not necessary in the District of Columbia. *Batson* seeks to eliminate all racial discrimination from jury selection—invidious or not. The strength of the prima facie case, not the location of the trial, must dictate the level of scrutiny the trial court should exercise.

■ Finally, and of central significance here, given the strength of appellant's prima facie case, the trial court erred in accepting on this record the prosecutor's explanations. *See People v. Turner,* 42 Cal.3d 711, 230 Cal.Rptr. 656, 666–67, 726 P.2d 102, 112–13 (1986). Rigorous scrutiny is essential because the "exclusion of even one black [or white] member of the venire for racial reasons violates" at least that prospective juror's rights under the equal protection clause, *Little v. United States,* 613 A.2d 880, 885 (D.C. 1992), and, further, because in this racially-charged case the Latino defendant was to be tried, after the prosecutor's peremptory strikes, exclusively before jurors of the victim's race. The court focused exclusively on whether the prosecutor's explanations about each rejected juror were logical and believa-

---

**6.** Initially, the trial court erroneously asserted that *Batson* did not apply to non-blacks. *See Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The court, however, corrected this statement during the motion for new trial.

ble rather than assessing each challenge in the entire context of the case and probing the prosecutor to determine why he had treated similarly situated black and white persons differently. The inherent logic and credibility of the prosecutor's individual explanations as to each stricken venireperson are not sufficient, taken only by themselves, to rebut such a prima facie case of racial discrimination when prospective jurors of several races who appear to be similarly situated—based on their answers to questions during voir dire—are accepted or rejected for jury service by apparent reference to race. A more rigorous scrutiny by the trial court is essential, especially in light of the prosecutor's elimination of all non-black venirepersons from the jury. The court's statements that "having read [the prosecutor's] conclusions, they sound perfectly logical to me," see supra note 2, and "I don't have any reason to disbelieve him," show that the court did not engage in the "closest possible scrutiny" of the formidable statistical evidence of racial discrimination, as required by Batson. See Jefferson, 631 A.2d at 15.

In this connection we note, initially, that the court erroneously said the prosecutor was merely attempting to eliminate highly educated whites from the jury because they would interpret "reasonable doubt" more seriously. Not only did the prosecutor never make this argument, but there is no evidence that the white venire members were more educated than the black members. Indeed, two black jurors in particular were highly educated: juror 893 was a dentist; juror 941 was a registered nurse.

The prosecutor's actual explanations, moreover, do not dispel prima facie discrimination, absent further probing by the trial court. The prosecutor claimed, for example, that he had struck juror 862—who was white—for her employment as a hospital worker, as well as for her reluctance to make eye contact with him. See supra note 2. The prosecutor, however, did not challenge jurors 893, 941, and 980—three other female hospital workers who were black—even though juror 980 was a victim of several

crimes and juror 941 explained that her brother had a pending drug prosecution.

Next, the prosecutor noted that crime victims may have "impermissible biases" and struck three white jurors—896, 950, 975—because either they or someone close to them had been a victim of crime. See supra note 2. The prosecutor, however, did not strike the three black jurors—001, 968, 980—who were victims of crime, even though their experiences had been just as serious, if not more so, than the white crime victims. In addition, the prosecutor struck two white jurors—950, 986—because they had friends or relatives who were lawyers, see supra note 2, but he did not strike a black juror—980—who had a lawyer friend. The presence of black jurors who possess the same characteristic as the eliminated white jurors indicates, at least in the absence of other material differences, that the prosecutor's explanations were pretextual. See Jones v. Ryan, 987 F.2d 960, 973 (3d Cir.1993).

Any time the trial court compares two similarly situated prospective jurors—for example, hospital workers—the prosecutor will be able to highlight individual differences. Here, the trial court could note that the prosecutor had been concerned that white juror 862's employment at the National Rehabilitation Hospital would make her "more likely to base her judgment of the guilt or non guilt of the defendant on pure speculation and on sympathy rather than on the facts of the case." But then the court should have asked the prosecutor why he had not been concerned enough about the predispositions of hospital employees to strike three black jurors who worked, respectively, at District of Columbia General Hospital (980), the Hospital for Sick Children (941), and Walter Reed Army Medical Center (893). The prosecutor could then respond—as he did—that the white juror also did not make eye contact with him. The trial court would then have to determine whether that difference highlighted by the prosecutor provided a sufficient, nondiscriminatory explanation, taking into account the strength of the prima facie showing of discrimination.[7] That kind

7. We are not implying that once a prosecutor

treats similarly situated white and black jurors

of analysis was not done here, and thus the prosecutor's explanations ring hollow in light of the large number of whites struck. "In the problem of racial discrimination, statistics often tell much, and Courts listen." *Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625, 632 (D.C.1989).

To rebut a prima facie showing as strong as appellant's, the prosecutor carried an especially heavy burden. Because whites constituted twenty-six percent of the venire, one might have expected, statistically, that two or three of the prosecutor's strikes would have been directed toward whites. Instead, nine were used to strike whites. As the actual number of strikes used against one race deviates further from the statistically expected result, a racial consideration—intentional or not—is more likely to be the true consideration behind the strikes. *See Ford v. State,* 262 Ga. 558, 423 S.E.2d 245, 248 (1992). Strikes based on race are even more likely to occur when the government's entire case turns, as it did here, on whether the jury believes the testimony of the black witness over the two white witnesses. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Poulnot v. District of Columbia,* 608 A.2d 134, 139 (D.C. 1992).

Appellant's prima facie showing of discrimination here was so compelling that the trial court should have probed the prosecutor in detail about his different treatment of similarly situated jurors. Even had the court done so, however, it is unlikely that the prosecutor, in light of his proffered reasons, could have rehabilitated his case for the peremptory strikes through further elaboration. Accordingly, because the trial court, despite a strong, clear, and timely defense request,

did not conduct a sufficient inquiry, and because the statistical evidence of racial considerations underlying the peremptory strikes was so strong, the court clearly erred in finding that the prosecutor's explanations were sufficient. *See Hernandez,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395.

Theoretically, we could remand for the trial court to conduct the kind of probing inquiry required on this record and to determine, after the inquiry, whether the prosecutor rebutted the prima facie showing of racial discrimination. We do not do so, however, for two related reasons: the explanations the prosecutor proffered, see *supra* note 2, as discussed in this opinion, leave little if any room for amplification that would produce a discernibly non-racial motivation for the peremptory strikes; and, in any event, it is unlikely that the prosecutor could cultivate his memory at this late date to elaborate further justifications that would credibly refine the reasons already proffered. While we do not say that a remand for further inquiry in a case like this could never be the appropriate remedy, we believe that under the circumstances here such an exercise would be futile. Accordingly, we reverse the judgment of conviction and remand the case for a new trial.

*Reversed and remanded.*

---

differently, there is no legitimate explanation he or she can give for doing so. Instead, we emphasize that the trial court must scrutinize every reason given, some of which will appear less inherently plausible than others. For example, "explanations which focus upon a venireperson's body language or demeanor must be closely scrutinized because they are subjective and can be easily used by a prosecutor as a pretext for excluding persons on the basis of race." *People v. Harris,* 129 Ill.2d 123, 135 Ill.Dec. 861, 884, 544 N.E.2d 357, 380 (1989). Explanations not

rationally related to traits involved in one's service as a juror or "a generalized statement of reasons for peremptory strikes" are also suspect and require rigorous trial court scrutiny. *See Little,* 613 A.2d at 886. Finally, race is an impermissible factor, even if a minor one, in exercising peremptory strikes. It need not be "the *sole* reason for discrimination nor the total factor of discrimination" to be impermissible. *Smith v. Sol D. Adler Realty Co.,* 436 F.2d 344, 350 (7th Cir.1971). "We find no acceptable place in the law for partial racial discrimination." *Id.*