**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellant,**

v.

**Frances JEANTY, Appellee.**

Nos. 96–CV–862, 96–CV–957.

District of Columbia Court of Appeals.

Argued June 2, 1998.

Decided Oct. 1, 1998.

Gerard J. Stief, with whom Robert L. Polk and Robert J. Kniaz, Washington, DC, were on the brief, for appellant.

Keith W. Donahoe, Greenbelt, MD, with whom Christopher R. Banker, Olney, MD, was on the brief, for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

Frances Jeanty, a passenger on a Metrobus operated by the Washington Metropolitan Area Transit Authority (WMATA), suffered a fractured shoulder and related serious injuries when the rear door of the bus allegedly malfunctioned, closed too quickly, and catapulted her off the bus and onto the pavement. Ms. Jeanty filed suit against WMATA, alleging primarily that the bus had been negligently maintained and inadequately inspected.[1] Following a four-day trial, the jury returned a verdict for the plaintiff in the amount of $560,000.

WMATA challenged the sufficiency of the evidence by a motion for a directed verdict at trial and by a post-trial motion for judgment as a matter of law (JMOL).[2] WMATA now reiterates this challenge on appeal. In a written order denying WMATA's post-trial

motion, the trial judge held that, although the case was a close one, the evidence was nevertheless sufficient to require its submission to the jury. We affirm.

## I.

### THE EVIDENCE

#### A. The accident.

The accident which precipitated this litigation occurred on November 13, 1991. Ms. Jeanty, who was then fifty-three years old and employed as a secretary-typist, testified that on the afternoon of that day she was alighting from a Metrobus on her way home from a shopping trip. According to Ms. Jeanty, the rear door of the bus suddenly and rapidly closed on her. Ms. Jeanty was "propelled" to the ground, and she suffered significant injuries.

Anne Ford, another passenger on the bus who was not previously acquainted with Ms. Jeanty, elaborated on Ms. Jeanty's account. Ms. Ford testified that the door ejected Ms. Jeanty "so fast, it would be like someone shot out of a cannon." Ms. Ford added that she had been riding Metro buses all of her life, and that she had never seen a bus door close so rapidly.[3]

#### B. The mechanism.

At trial, Ms. Jeanty's counsel called a WMATA maintenance inspector, John Shoemaker, as an expert witness. Counsel also introduced the deposition testimony of Michael D. Cowager, a WMATA maintenance analyst. The uncontradicted testimony of the two WMATA representatives established that the speed at which the rear door closes is controlled by a "door speed regulator." The appropriate setting for the regulator is six seconds, three to open and three to close.

#### C. The preventive maintenance schedule.

At all times relevant to this appeal, WMATA had in place a preventive maintenance

1. Ms. Jeanty also alleged that the bus driver was negligent and that his negligence was the proximate cause of her injuries. In its verdict, the jury specifically resolved this issue in the driver's favor.

2. Post-verdict JMOL motions were formerly known as motions for judgment notwithstanding the verdict (JNOV).

3. The driver of the bus was called as a witness, but he had no recollection or knowledge of the incident.

schedule designed to assure the safety of its buses. Pursuant to this schedule, the bus on which Ms. Jeanty was riding was supposed to be inspected every two weeks. Under WMATA's guidelines, the inspection was to include, among other things, a check of the adjustment of the door speed regulator.

WMATA maintenance records, which were introduced into evidence by Ms. Jeanty's attorney, established that the bus on which Ms. Jeanty was riding should have been inspected on October 1, 1991, October 15, 1991, October 29, 1991, and November 12, 1991. In fact, however, the bus was not inspected on any of these days. The accident occurred on November 13, 1991, the day after the last scheduled inspection.

There was also evidence that WMATA's "Standard Operating Procedures" (SOP's) required the bus driver to check the rear door for proper operation before taking the bus out for the day. The record does not reveal whether or not the driver who initially operated the bus in question on the day of the accident complied with this SOP.

## II.

## LEGAL DISCUSSION

### A. *The standard of review.*

■ On a motion for a directed verdict, the record must be viewed in the light most favorable to the non-moving party, and that party (here Ms. Jeanty) is entitled to the benefit of every reasonable inference from the evidence. *See, e.g., Shewmaker v. Capital Transit Co.*, 79 U.S.App.D.C. 102, 103, 143 F.2d 142, 143 (1944). If the evidence, so assessed, is insufficient to support a verdict in Ms. Jeanty's favor—if, in other words, no impartial juror could reasonably find for Ms. Jeanty—then WMATA is entitled to judgment as a matter of law. *Id.; see also* Super. Ct. Civ. R. 50(a). Whether the evidence was sufficient to go to the jury is a question of law, which we consider *de novo*. *Phillips v. District of Columbia*, 714 A.2d 768, 772–73 (D.C.1998) (citations omitted);

*Nobelpharma A.B. v. Implant Innovations, Inc.*, 141 F.3d 1059, 1064 (Fed.Cir.1998) (*de novo* standard applies to post-trial JMOL motion).

### B. *WMATA's obligations as a common carrier.*

■ "The plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C.1988) (citation and internal quotation marks omitted). WMATA contends that the evidence as to each of these elements was insufficient, as a matter of law, to satisfy Ms. Jeanty's burden. We disagree.

A common carrier transports precious human cargo, and the courts have long analyzed the relationship between the carrier and its passengers accordingly. The Supreme Court declared almost one and a half centuries ago that "[w]hen carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and safety require that they be held to the greatest possible care and diligence." *Philadelphia & Reading R.R. Co. v. Derby*, 55 U.S. (14 How.) 468, 486, 14 L.Ed. 502 (1852).[4] Twenty-eight years later, the Court stated that although a common carrier—in that case a railroad— "does not warrant the safety of the passengers, at all events," its agents must "observe the utmost caution characteristic of very careful, prudent men" and must exercise "extraordinary vigilance aided by the highest skill." *Pennsylvania Co. v. Roy*, 102 U.S. 451, 456, 26 L.Ed. 141 (1880).

The foregoing principles have long been a part of the law of the District of Columbia. In *Capital Traction Co. v. Copland*, 47 App. D.C. 152, 159 (1917), the court, relying on the Supreme Court's decision in *Roy*, stated that common carriers "are bound to exercise extraordinary vigilance [aided] by the highest skill for the purpose of protecting their passengers against injury resulting from defects

---

**4.** This principle applies by analogy to the equally or more dangerous agency of a modern Metro- bus.

in ways or instrumentalities used by the carriers." This requirement has grown "[o]ut of the special solicitude [shown by the courts] for the safety of human cargo," *Birchall v. Capital Transit Co.,* 34 A.2d 624, 625 (D.C. 1943), and "no rule is better established than that which holds a common carrier to the highest degree of care towards its passengers for hire." *Missile Cab Ass'n, Inc. v. Rogers,* 184 A.2d 845, 847 (D.C.1962); *see also Sebastian v. District of Columbia,* 636 A.2d 958, 962 (D.C.1994) (quoting *Missile Cab Ass'n, supra* ). In *Schaller v. Capital Transit Co.,* 99 U.S.App.D.C. 253, 254, 239 F.2d 73, 74 (1956) (per curiam), a case in which the plaintiff was injured while alighting from a bus, the court held that it is the duty of a carrier to use the highest degree of care in, *inter alia,* "provid[ing] [to the passenger] safe and convenient means of entering and leaving the bus."

■ Notwithstanding these authorities, however, we have held, as the Supreme Court did in *Roy, supra,* 102 U.S. at 456, that a carrier is not an insurer of its passengers' safety. *D.C. Transit Sys., Inc. v. Smith,* 173 A.2d 216, 217 (D.C.1961). On the contrary, the passenger has the burden of proving negligence, *i.e.,* that the carrier failed to exercise reasonable care under the circumstances. *See, e.g., Bray v. D.C. Transit Sys., Inc.,* 179 A.2d 387, 388–89 (D.C.1962). In *D.C. Transit Sys., Inc. v. Carney,* 254 A.2d 402, 403 (D.C.1969), the court quoted from the cases holding that common carriers are held to the "highest degree of care," but opined that "there are no categories of care; *i.e.,* the care required is always reasonable care." More recently, we have stated that

> although the language in our cases speaks of the high degree of care required of a common carrier, the cases all hold that a common carrier is subject to essentially the same standard as any other alleged

tortfeasor, *i.e.,* an obligation to exercise due care.

*Sebastian, supra,* 636 A.2d at 962 (citing *McKethean v. WMATA,* 588 A.2d 708, 712 (D.C.1991)); *cf. Pazmino v. WMATA,* 638 A.2d 677, 679 n. 3 (D.C.1994) (noting the variations in our precedents in the articulation of the standard, but emphasizing that "the greater the danger, the greater the care that must be exercised"). Whether or not all of our cases can be fully harmonized with respect to the existence or non-existence of a separate standard of care for common carriers,[5] all of the decisions recognize that the standard is always contextual, and that the carrier's relation to, and duties toward, its passengers constitute the critical context in which the carrier's conduct is evaluated.

■ The carrier's duty of care, vigilance, and foresight applies with particular force to the maintenance of its equipment. "[A] common carrier is bound to exercise a high or the highest degree of care and diligence in the ... maintenance, inspection, and use of its conveyances and their appliances...." 14 AM.JUR.2D *Carriers* § 1028, at 450 & nn. 12 & 13 (1964 & Supp.1998). We have stated that "[a] bus company, like any other common carrier, is bound to inspect its vehicles to be certain they are in proper operating order and free from any condition which may be dangerous to passengers." *Bray, supra,* 179 A.2d at 389. Because a carrier must use the highest degree of care in assuring the safety of its passengers, its vehicles and equipment must be "vigilantly and regularly inspected." *Burnell v. Sportran Transit Sys. Co.,* 421 So.2d 1199, 1201 (La.App.), *writ denied,* 423 So.2d 1183 (La.1982). The duty to inspect is not continuous; the carrier need not, for example, immediately re-inspect a bus whenever snow begins to fall, for the timing of inspections "must be consistent with the practical operation of the bus." *Bray, supra,* 179 A.2d at 389.[6] Nevertheless,

---

5. *Cf. Pistorio v. Washington Ry. & Elec. Co.,* 46 App.D.C. 479, 484 (1917) ("The highest degree of care only means reasonable care in the superlative degree, and the charge that 'the railway company was bound to exercise all the care and skill and foresight within reason' states the same degree in different language.").

6. The carrier's obligation to inspect the bus while it is at rest is obviously more exacting than the driver's duty to inspect while operating the bus. *See Proud v. Philadelphia & Reading R.R. Co.,* 64 N.J.L. 702, 46 A. 710, 711 (E. & A.1900). In this case, we are dealing with four consecutive missed "at rest" inspections.

[c]arriers are under the highest duty to provide and maintain suitable and safe equipment and appliances.... [N]othing can exempt [carriers] from liability as for defects therein, except that they are latent ones which no reasonable degree of skill and diligence would discover or prevent.

*Southeastern Greyhound Lines v. Callahan,* 244 Ala. 449, 13 So.2d 660, 663 (1943) (citation omitted); *see also Kentucky Traction & Terminal Co. v. Roman's Guardian,* 232 Ky. 285, 23 S.W.2d 272, 274 (1929) (carrier must use "the utmost care and skill ... to inspect [its equipment] and keep the same in repair," and to prevent it from becoming defective); *Leslie v. Georgia Power Co.,* 47 Ga.App. 723, 171 S.E. 395, 395 (1933) (inspections should be "adequate and sufficient, and should be made with such frequency as the liability to impairment reasonably requires" (citations omitted)).

 In light of the common carrier's obligation as described above, "the courts are generally agreed that when a passenger is injured by machinery and appliances wholly under the carrier's control, this fact is sufficient prima facie to show negligence." *Humphries v. Queen City Coach Co.,* 228 N.C. 399, 45 S.E.2d 546, 548 (1947).[7] As the court stated in an early case in this jurisdiction,

[i]t is undoubtedly the law that, as between passenger and carrier, where the causes which produce the accident are peculiarly within the knowledge of the carrier, the plaintiff may make out a prima facie showing of negligence merely by proving the relation of the parties and the happening of the accident. In such a case an inference of negligence arises which calls for

rebuttal by defendant carrier, and which, in the absence of rebuttal or explanation, is sufficient to send the case to the jury and to support a verdict for plaintiff.

*Pistorio, supra* note 5, 46 App.D.C. at 485–86. These decisions are consistent with fundamental considerations of fairness, *see United States v. New York, New Haven & Hartford R.R. Co.,* 355 U.S. 253, 256 n. 5, 78 S.Ct. 212, 2 L.Ed.2d 247 (1957), for the facts relating to the maintenance and inspection of a vehicle's equipment are peculiarly within the knowledge of the carrier and, upon a showing of injury resulting from a malfunctioning appliance, the burden should be allocated accordingly. *Cf. Selma, Rome & Dalton R.R. Co. v. United States,* 139 U.S. 560, 568, 11 S.Ct. 638, 35 L.Ed. 266 (1891).[8] A prima facie showing of negligence is ordinarily sufficient to require submission of the case to the jury, *Pistorio, supra* note 5, 46 App.D.C. at 485–86, at least in the absence of evidence establishing contributory negligence as a matter of law. *Humphries, supra,* 45 S.E.2d at 548.[9]

### C. The sufficiency of the evidence.

Applying the foregoing principles to the present record, we conclude that the evidence, viewed in the light most favorable to Ms. Jeanty, was sufficient to support the jury's verdict.

In *Slaughter v. D.C. Transit Sys., Inc.,* 104 U.S.App.D.C. 275, 261 F.2d 741 (1958), the rear door of a bus closed on the foot of the plaintiff, a young girl, as she was attempting to alight, injuring her ankle. The plaintiff claimed that in the absence of negligence on

---

7. The Supreme Court of Louisiana has gone further:

The mere showing of injury to a fare-paying passenger on a public conveyance and his failure to reach his destination safely establishes a prima facie case of negligence and imposes the burden on the carrier of convincingly overcoming such case.

*Wise v. Prescott,* 244 La. 157, 151 So.2d 356, 359 (1963); *accord, Jackson v. New Orleans Pub. Serv. Inc.,* 342 So.2d 258, 259 (La.App.1977). We have no occasion to express either agreement or disagreement with the quoted language from *Wise.*

8. [W]here the vehicle or conveyance is shown to be under the control or management of the

carrier or his servants, and the accident is such as, under an ordinary course of things, does not proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care.

*Georgia Pac. Ry. Co. v. Love,* 91 Ala. 432, 8 So. 714, 715 (1891) (internal quotation marks omitted) (quoting *Dougherty v. Missouri R.R. Co.,* 81 Mo. 325, 329 (1884)).

9. In the present case, the jury expressly found that Ms. Jeanty was not contributorily negligent. WMATA does not challenge that finding on appeal.

the part of the carrier, the door would have remained open long enough for her to withdraw her foot, or would immediately have sprung open "when it met an obstacle in the path of its normal closing, provided the safety device was operating properly." *Id.* at 276, 261 F.2d at 742. The trial judge directed a verdict in favor of the carrier. Applying the doctrine of *res ipsa loquitur*, the appellate court reversed. In an opinion written by Judge (later Chief Justice) Burger, the court held that

> [t]aken as a whole, the evidence is sufficient so that a jury could find (1) that some negligence of appellee was the proximate cause of appellant's injury, and (2) that the appellant's conduct was not a proximate cause of the injury. Of course, the jury might with equal propriety conclude the contrary, but it was error to direct a verdict for the appellee.

*Id.* at 277, 261 F.2d at 743.

■ The decision in *Slaughter* is significant, for in that case, the evidence was held sufficient to go to the jury even though the plaintiff had adduced no evidence as to the cause of the accident and had offered no proof that the carrier failed to conduct regular inspections. In the present case, Ms. Jeanty introduced evidence of the kind not presented in *Slaughter*. Ms. Jeanty's case is therefore stronger than that of the plaintiff in *Slaughter*. We need not decide whether the doctrine of *res ipsa loquitur* is applicable,[10] for there was sufficient evidence in this record of negligence and causation to go to the jury.

First, Ms. Jeanty presented expert testimony from which the jury could reasonably infer that the rear door of the bus closed too quickly and that it did so as a result of a malfunction of the door speed regulator. The plaintiff's case would undoubtedly have been stronger if her expert witness—a representative of WMATA—had been asked whether the accident probably resulted from negligent maintenance, and if he had answered that question in the affirmative. Nevertheless, the authorities cited in Part II.B of this opinion, as well as the decision in *Slaughter*, persuade us that, even without expert testimony identifying the likely cause of the malfunction, the plaintiff made a prima facie showing of negligent maintenance, so that the case was properly allowed to go to the jury on that issue.

Second, Ms. Jeanty presented evidence that WMATA failed to conduct four consecutive bi-weekly inspections required by its own preventive maintenance schedule, and that the accident happened on the day after the last of these missed inspections was supposed to have taken place. On this record, an impartial jury could rationally find that WMATA did not "exercise ... the highest degree of care and diligence," 14 Am.Jur.2d *Carriers, supra,* § 1028, at 450, in inspecting the operation of the rear door and the door speed regulator.[11]

■ A carrier's failure to comply with its own procedures is not *per se* proof of negligence. *Garrison, supra* note 11, 196 A.2d at 925. In this case, however, WMATA has not explicitly disputed the proposition that if proof of the missed inspections was correctly admitted, there was evidence from which the

---

10. *See generally,* Thomas R. Trenkner, Annotation, *Application of Res Ipsa Loquitur Doctrine to Accidents Incurred by Passenger While Boarding or Alighting From a Carrier,* 93 A.L.R.3d 776 (1979 & Supp.1998). In the present case, the trial judge concluded that the doctrine of *res ipsa loquitur* did not apply, perhaps because Ms. Jeanty had failed to establish by expert testimony that an accident of the kind that injured Ms. Jeanty does not ordinarily occur in the absence of negligence. *See Hailey v. Otis Elevator Co.,* 636 A.2d 426, 428 (D.C.1994) (setting forth the elements of *res ipsa loquitur*).

11. WMATA contended in the trial court, and again asserts on appeal, that the trial judge erred in admitting evidence of WMATA's internal procedures and of WMATA's failure to adhere to those procedures in this case. This court squarely rejected a similar contention in *Garrison v. D.C. Transit Sys., Inc.,* 196 A.2d 924 (D.C.1964). We held in that case, in conformity with the majority rule nationally, that "regulations of a defendant for guidance of its employees are admissible and may be considered on the issue of whether due care was exercised by the employee under the particular circumstances of the case." *Id.* at 925 (citing, *inter alia, Koninklijke Luchtvaart Maatschappij N.V. v. Tuller,* 110 U.S.App. D.C. 282, 289, 292 F.2d 775, 782, *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961)).

jury could reasonably find that WMATA had failed to comply with the standard of care governing the inspection of its equipment. Although WMATA contends that Ms. Jeanty could not establish negligent maintenance without expert testimony establishing the standard of care and its breach, WMATA's brief contains no claim that Ms. Jeanty was obliged to present expert testimony as to the appropriate frequency of inspections. But even if we were to treat this issue as having been implicitly contested by WMATA, then WMATA's departure from its own inspection schedule was sufficiently extreme to support a prima facie showing that WMATA had failed to exercise the "highest degree of care." An impartial jury could therefore reasonably find, even without expert testimony on the subject, that WMATA's repeated failures to inspect the bus violated the carrier's duty to assure that its equipment be "vigilantly and regularly inspected," *Burnell, supra*, 421 So.2d at 1201, and constituted actionable negligence.

### D. *Constructive notice.*

██ WMATA contends that Ms. Jeanty "failed to present any evidence, let alone legally sufficient evidence, of notice to allow the jury's verdict to stand." Ms. Jeanty responds that "the jury could reasonably infer, from the very nature of WMATA's inspection responsibilities, that [WMATA] had *constructive* notice of the problem." We agree with Ms. Jeanty.

██ The essence of Ms. Jeanty's case was that the allegedly defective door speed regulator represented an unreasonably dangerous condition, and that WMATA failed to discover this dangerous condition because it neglected to conduct the necessary inspections. Ms. Jeanty does not claim that WMATA knew that the regulator was defective. Rather, she contends that WMATA had constructive notice because, "in the exercise of reasonable care, ... [the] existence [of the dangerous condition] should have become known and corrected." *Anderson v. Woodward & Lothrop*, 244 A.2d 918, 918 (D.C. 1968) (per curiam). The question of constructive notice is one "peculiarly within the province of the jury." *Hines v. Safeway*

*Stores, Inc.*, 379 A.2d 1174, 1175 (D.C.1978); *see also Whitehouse v. Safeway Stores, Inc.*, 385 A.2d 755, 757 (D.C.1978) (per curiam).

Ms. Jeanty concededly did not establish that the door speed regulator ever malfunctioned before November 13, 1991. There was therefore no conclusive proof that the regulator was in defective condition at any time prior to the accident. We do not believe, however, that Ms. Jeanty's case was fatally defective on that account. If WMATA had conducted all (or even some) of the inspections that its preventive maintenance schedule required, then a trier of fact could have determined with some assurance whether the defect did or did not exist on the date of a particular inspection. Having negligently failed to inspect, WMATA cannot now claim victory upon the ground that the plaintiff was unable to establish facts which the missed inspections might well have revealed. No party should be allowed to take advantage of its own wrong, *see, e.g., Farris v. Compton*, 652 A.2d 49, 55 (D.C.1994), and it would surely be paradoxical to permit WMATA, which failed to carry out inspections which its own procedures ordained, to obtain judgment in its favor because Ms. Jeanty was prevented from proving what the results of any such inspections would have been.

In sum, an impartial jury could reasonably conclude that the accident resulted from a defect in the door speed regulator and that, under all of the circumstances, WMATA should have known of the malfunction and remedied it.

### E. *Causation.*

██ WMATA also challenges the sufficiency of the evidence of causation:

[E]ven assuming, *arguendo*, that there was a defect in the adjustment of the door speed regulator, at the time of Plaintiff's fall, [Ms. Jeanty has failed to show] that this purported defect was the result of a misadjustment by a mechanic, as opposed to the bus, for example, going over a pothole a block from where Plaintiff exited the bus.

WMATA presented evidence showing that no incident involving the improper operation of the rear door was reported during the ten

days preceding the accident or during the ten days that followed. WMATA now argues that the jury could not determine, without resorting to speculation, whether any defect in the door speed regulator existed at the time of the missed inspections and would have been discovered if those inspections had taken place.

It would undoubtedly have been helpful to the court and jury if one party or the other had provided expert testimony on the feasibility or lack thereof of WMATA's pothole theory. Although "[j]urors can be assumed to have ridden buses," *WMATA v. O'Neill,* 633 A.2d 834, 841 n. 14 (D.C.1994), the workings of the mechanism that controls the speed at which the rear door of a bus will close, and the circumstances under which such a mechanism may go awry, are not within the ken of a lay trier of fact. *Cf. D.C. Transit Sys., Inc. v. Smith, supra,* 173 A.2d at 217 ("While it is common knowledge that motor buses, like all motor vehicles, require oil and grease in their operation and maintenance, it would be pure speculation for a jury to find that the two spots on the rear steps of the bus were the result of some action by some employee of the carrier.").

But WMATA's position rests on two rather improbable hypotheses. First, WMATA assumes that an encounter with a pothole, even an encounter so unremarkable that the incident was not recalled by the driver or by any other witness, could so disable the door speed regulator that Ms. Jeanty would be catapulted out of the bus. If so much damage could result from so apparently commonplace an event, then WMATA's bi-weekly inspection schedule hardly appears adequate.[12] Second, WMATA's theory necessarily attributes to coincidence the occurrence of the accident during a rather brief period after four missed inspections, the last of which should have been conducted on the day before Ms. Jeanty's injury. "Coincidences happen, but an alternative explanation not

predicated on happenstance is often the one that has the ring of truth." *Tursio v. United States,* 634 A.2d 1205, 1213 (D.C.1993) (quoting *Poulnot v. District of Columbia,* 608 A.2d 134, 139 (D.C.1992)).[13]

According to WMATA, (1) the regulator may have been functioning properly at the times the bus was supposed to be inspected; (2) it may have become disabled thereafter; and (3) Ms. Jeanty did not sufficiently disprove these hypotheses to permit the case to go to the jury. Assuming the truth of the first two of these propositions, we are unpersuaded by the third.

Ms. Jeanty may well have failed to prove, beyond a reasonable doubt, that the accident was not caused by a recent bump. Her evidence did not establish to a moral certainty that a defect in the regulator existed at the relevant times and would have been discovered if the preventive maintenance inspections had been held. The existence of a reasonable doubt does not, however, entitle WMATA to judgment notwithstanding the verdict. There was evidence in this case from which an impartial jury could reasonably conclude that the accident resulted from a defect in the door speed regulator. The regulator was under WMATA's exclusive control, and its operation was peculiarly within WMATA's knowledge. *See Pistorio, supra* Note 5, 46 App.D.C. at 485–86. This evidence was sufficient to permit the case to go to the jury, *see Humphries, supra,* 45 S.E.2d at 548, especially in conjunction with the proof of the missed inspections.

WMATA was free to present expert testimony to rebut Ms. Jeanty's prima facie case, and to attempt to prove that WMATA's "recent bump" hypothesis was a plausible or even probable explanation for the accident. On the record before us, however, we are satisfied that the trial judge correctly left the issue to the jury.

---

12. We note, however, that WMATA also required its drivers to check the operation of the doors on a daily basis. The record does not reveal whether this was done.

13. It is worth noting, however, that judicial skepticism regarding coincidences may be a two-

edged sword. If the door speed regulator was not functioning properly on the day of the accident, it is arguably somewhat odd that no other incident involving the rear door of the bus in question was reported within ten days before or after November 13, 1991.

## III.

## CONCLUSION

For the foregoing reasons, the judgment is *Affirmed.*[14]

TERRY, Associate Judge, concurring:

I agree that the judgment should be affirmed, and I join in Judge Schwelb's opinion for the court. I write separately, however, to emphasize that Judge Schwelb's opinion should not be read as imposing on a common carrier a standard of care different from or greater than the duty that rests on any other defendant in a negligence case. On the contrary, "the cases all hold that a common carrier is subject to essentially the same standard as any other alleged tortfeasor, *i.e.,* an obligation to exercise due care." *Sebastian v. District of Columbia,* 636 A.2d 958, 962 (D.C.1994); *accord, e.g., McKethean v. WMATA,* 588 A.2d 708, 712 (D.C.1991) (carrier "owes a duty of reasonable care to its passengers" (citations omitted)). What is "reasonable" may vary from case to case, depending on the facts, but the standard of care does not change.

In addition, if it were necessary to decide the appeal, I would expressly affirm the trial court's ruling that the doctrine of *res ipsa loquitur* does not apply to this case because Ms. Jeanty failed to present sufficient evi-

---

**14.** WMATA's remaining contentions do not require extensive discussion. WMATA claims that the award of damages was excessive and that the trial judge should have granted WMATA's motion for a new trial or a remittitur. In denying that motion, the judge wrote as follows:

> The issue of damages is equally close. The award of $560,000 is much higher than the court would have predicted based on the evidence, but not so high as to shock the court's conscience or justify either a remittitur or a new trial. There was ample testimony from which the jury could find that plaintiff suffered a painful and debilitating injury to her shoulder which, even after a successful surgery, has left her with a permanently impaired range of motion. The testimony regarding the extremely uncomfortable body and shoulder brace plaintiff was required to wear twenty-four hours a day for many weeks after her surgery would, standing alone, justify a substantial award for pain, suffering and inconvenience. The court cannot say with any certainty that the jury's award was based on passion, prejudice, pure sympathy or any other impermissible factor. On the contrary, the award, while substantial, represents a permissible exercise of the authority our system gives to jurors to arrive at an amount which, in their collective and unanimous judgment, will fairly and reasonably compensate a person injured by the negligence of another not only for so-called "special damages," but also for the more intangible elements of damages, including pain, suffering, inconvenience, disability and the like. The court is not empowered to deprive plaintiff of her verdict simply because it may think the jury should have awarded a lower amount.

We believe that the judge addressed the issue of damages candidly and in a balanced manner, and we discern no error of law. *See, e.g., Otis*

*Elevator Co. v. Tuerr,* 616 A.2d 1254, 1261 (D.C. 1992); *Graling v. Reilly,* 214 F.Supp. 234, 235 (D.D.C.1963).

Before we leave the issue of damages, we note that in their brief on appeal, Ms. Jeanty's attorneys have been quite selective in quoting from the trial judge's order. Specifically, in reproducing in their brief the passage we have quoted above, they have begun their quotation with the second sentence, thus omitting the judge's comment that the issue is a close one. Counsel have also left out the judge's observation that the award "is much higher than the court would have predicted based on the evidence," and they have replaced that phrase with an ellipsis. As a result, the portions of the judge's order selectively reproduced in counsel's brief convey an incomplete and misleading impression as to the judge's views. Even in this age of "hardball" litigation, we would appreciate greater candor in counsel's submissions.

Finally, WMATA asserts that, during jury selection, Ms. Jeanty's attorney exercised his peremptory challenges in a racially discriminatory manner. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial judge carefully considered WMATA's allegations in this regard, and he found that discriminatory animus had not been established. This finding by the judge turned on his on-the-scene assessment of counsel's credibility, and we are in no position to second-guess a determination which was obviously informed by the judge's observation of counsel's demeanor. *See, e.g., Jefferson v. United States,* 631 A.2d 13, 17 & n. 8 (D.C.1993). In the present case, blacks represented 64% of the venire and 75% of the jury (including alternates), a situation quite unlike *Capitol Hill Hosp. v. Baucom,* 697 A.2d 760 (D.C.1997) (per curiam), a case on which WMATA relies. There was no error.

dence to raise a *res ipsa* issue. See footnote 10 of Judge Schwelb's opinion, *ante* at 177. In light of the other evidence, however, I agree with Judge Schwelb that we need not address the point.

Finally, I specifically endorse the views expressed in the next-to-last paragraph of footnote 14 of Judge Schwelb's opinion.